In The

# United States Court of Appeals

## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

v.

## KEWAN MARQUIS SHADE,

*Defendant – Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT ASHEVILLE

———————

## BRIEF OF APPELLANT

———————

**James W. Kilbourne, Jr.**
**ALLEN STAHL & KILBOURNE, PLLC**
**20 Town Mountain Road, Suite 100**
**Asheville, North Carolina 28801**
**(828) 412-4024**

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION .................................................................. 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF CASE ........................................................................ 2

STATEMENT OF THE FACTS ............................................................. 5

SUMMARY OF THE ARGUMENT ....................................................... 6

ARGUMENT ............................................................................................. 6

    I.    The District Court committed significant procedural and
        legal errors at each stage of sentencing ................................. 6

        A.    Standard of Review ........................................................ 6

        B.    Required Procedure at Sentencing ............................... 8

        C.    The District Court failed to properly determine the
            initial guidelines range ................................................ 10

            1.    Crime of Violence: Base offense level ................. 10

                 Enumerated Offenses Clause ............................. 11

                 Elements Clause .................................................. 13

                 Lack of Intent Requirement in North
                 Carolina Law ....................................................... 14

i

Lack of Requirement for Communicated Threat in North Carolina Law............................. 17

    2.    Reckless Endangerment during flight ............... 21

D.    The District Court failed to properly consider Departures and other Specific Offender Characteristics............................................................. 23

E.    The District Court failed to properly apply the "applicable factors in 18 U.S.C. § 3553........................ 27

    1.    Consideration of Sentencing Statistics to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct ......... 28

    2.    Application of the Guidelines in fashioning a sentence under 18 U.S.C. § 3553 ........................ 31

II.    The Defendant has the right to bear arms under the Second Amendment .............................................................. 32

A.    The Defendant has the right to bear arms under the Second Amendment................................................. 35

    1.    *Bruen* overhauled the test for determining whether government action infringes on the right to keep and bear arms ................................. 35

    2.    *Bruen* also abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment............................................. 42

B.    *Bruen* also abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment................................................................. 47

  C.  The government cannot show "an American tradition" that individuals convicted of a felony may not possess a gun ................................................. 48

    1.  Forever depriving all felons of their right to bear arms does not comport with English history ............................................................... 50

    2.  Forever depriving all people convicted of a felony of their right to bear arms does not comport with colonial and Founding-era history ............................................................. 52

    3.  Forever depriving all felons of their right to bear arms does not comport with 19th-century history .................................................... 53

    4.  Although 20th-century history is irrelevant to the Second Amendment's scope, it confirms that §922(g)(1) is incompatible with the Nation's history and tradition of firearm regulation............................................................ 55

III.  The Defendant had a right to present confidential mental health information used in mitigation of his sentence under seal .............................................................. 56

CONCLUSION .......................................................................... 64

REQUEST FOR ORAL ARGUMENT ....................................... 65

CERTIFICATE OF COMPLIANCE ........................................... 67

CERTIFICATE OF FILING AND SERVICE ........................... 68

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Binderup v. Att'y Gen. of the U.S.*,
    836 F.3d 336 (3d Cir. 2016) ........................................... 52

*District of Columbia v. Heller*,
    554 U.S. 570, 128 S. Ct. 2783,
    171 L. Ed. 2d 637 (2008) .........................................*passim*

*Faust v. S.C. State Highway Dep't*,
    721 F.2d 934 (4th Cir. 1983) ........................................... 42

*Folajtar v. Att'y Gen. of the U.S.*,
    980 F.3d 897 (3d Cir. 2020) ........................................... 47

*Gall v. United States*,
    552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007) ....... 7, 8, 9, 26

*Hengle v. Treppa*,
    19 F.4th 324 (4th Cir. 2021) ........................................... 43

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ....................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    ___ U.S. ___, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) .........*passim*

*N.L.R.B. v. Bluefield Hosp. Co., LLC*,
    821 F.3d 534 (4th Cir. 2016) ........................................... 43

*Peugh v. United States*,
    569 U.S. 530, 133 S. Ct. 2072, 186 L. Ed. 2d 84 (2013) .................. 8

*Sir John Knight's Case*,
    3 Mod. 117, 87 Eng. Rep. 75 (K. B. 1686) ...................................... 59

*United States v. Bell*,
    667 F.3d 431 (4th Cir. 2011) ........................................................ 7

*United States v. Booker*,
    543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)................... 8

*United States v. Carpio-Leon*,
    701 F.3d 974 (4th Cir. 2012).................................................... 35, 43

*United States v. Carter*,
    564 F.3d 325 (4th Cir. 2009) ........................................................ 7

*United States v. Carter*,
    669 F.3d 411 (4th Cir. 2012) ...................................................... 43

*United States v. Chester*,
    628 F.3d 673 (4th Cir. 2010)................................................. 36, 43, 47

*United States v. Daughtrey*,
    874 F.2d 213 (4th Cir. 1989) ..................................................... 8, 10

*United States v. Evans*,
    526 F.3d 155 (4th Cir. 2008) ........................................................ 7

*United States v. Lewis*,
    958 F.3d 240 (4th Cir. 2020)................................................. 7, 26, 32

*United States v. Montes-Pineda*,
    445 F.3d 375 (4th Cir. 2006) ....................................................... 28

*United States v. Moore*,
    666 F.3d 313 (4th Cir. 2012)......................................... 36, 46, 47, 63

*United States v. Nance*,
    957 F.3d 204 (4th Cir. 2020) ....................................................... 28

*United States v. Pearce,*
191 F.3d 488 (1999) ........................................................................... 7

*United States v. Pruess,*
703 F.3d 242 (4th Cir. 2012) .............................................. 36, 46, 47

*United States v. Smoot,*
690 F.3d 215 (4th Cir. 2012) ..................................................... 46, 47

*United States v. Steffen,*
741 F.3d 411 (4th Cir. 2013) ....................................................... 8, 10

*United States v. Verdugo-Urquidez,*
494 U.S. 259, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990) .............. 48

*United States v. Williams,*
155 F.3d 418 (4th Cir. 1998) ............................................................ 42

## CONSTITUTIONAL PROVISION

U.S. Const. amend. I ................................................................. *passim*

U.S. Const. amend. II ................................................................ *passim*

U.S. Const. amend. IV ...................................................................... 48

U.S. Const. amend. IX ...................................................................... 48

U.S. Const. amend. X ....................................................................... 48

## STATUTES

18 U.S.C. § 922(g) ..................................................................... *passim*

18 U.S.C. § 922(g)(1) ................................................................. *passim*

18 U.S.C. § 922(g)(13) ..................................................................... 43
18 U.S.C. § 924(e) ........................................................................... 13

18 U.S.C. § 3231 ............................................................. 2

18 U.S.C. § 3553 ....................................................... *passim*

18 U.S.C. § 3553(a) .................................. 8, 9, 27, 28, 32, 63

18 U.S.C. § 3553(a)(4)(a)(i). ...................................... 32

18 U.S.C. § 3553(a)(6) ................................................ 28

28 U.S.C. § 1291 .......................................................... 2, 5

## GUIDELINES

U.S.S.G. § 1B1.1(c) .................................................... 10

U.S.S.G. § 2K2.1(a)(4)(A) ............................... 10, 21, 15

U.S.S.G. § 2K2.1(a)(6)(A) ........................................ 11

U.S.S.G. § 4B1.2 ....................................................... 31

U.S.S.G. § 4B1.2(a) ............................................. 13, 15

U.S.S.G. § 4B1.2(a)(1) .............................................. 13

U.S.S.G. § 4B1.2(a)(2) ......................................... 11, 13

U.S.S.G. § 5H1.3 ................................................... 4, 25

U.S.S.G. § 5K2.11 ................................................. 4, 26

U.S.S.G. § 5K2.13 ................................................. 4, 23

## OTHER AUTHORITIES

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551 (2009) ......... 49

Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U. Chi. L. Rev. 1175 (1989) ..................................................................... 43

Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), https://sites.law.duke.edu/ secondthoughts/2019/06/27/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/ ................................................. 49

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695 (2009) .......................................... 50, 51, 55

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443 (2009) ..................................................... 35

Federal Firearms Act (FFA), ch. 850, § 2(e), 52 Stat. 1250 .................. 55

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/ncw20.pdf ........................................................... 30

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY20.pdf ...................... 29

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ........................................................................ 50, 51

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994) ........................................ 51

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007)........................... 53

Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87* (1893) ..................................................................... 53

Case No. 22-4384

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
Appellee,

v.

KEWAN MARQUIS SHADE,
Defendant/Appellant.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT ASHEVILLE
_____

BRIEF FOR DEFENDANT/APPELLANT
KEWAN MARQUIS SHADE
_____

**STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION**

Mr. Shade appeals from a final judgment entered pursuant to a plea

agreement for one count of Possession of a Firearm by a Convicted Felon

in violation of 18 U.S.C. §922(g)(1). All of the alleged criminal activities

occurred within the territorial jurisdiction of the Western District of

North Carolina and the United States Court of Appeals for the Fourth

Circuit. The District Court had jurisdiction under 18 U.S.C. §3231, and this Court has jurisdiction under 28 U.S.C. §1291.

The District Court announced its judgment in open court on June 23, 2022 and filed its final written judgment on June 27, 2022. After sentencing, Mr. Shade filed a timely Notice of Appeal on July 7, 2022.

## STATEMENT OF THE ISSUES

I.    Whether the District Court committed significant procedural and legal errors at Sentencing.

II.   Whether the Second Amendment protected the Defendant's right to possess firearms.

III.  Whether the Defendant could present confidential mental health information used in mitigation of his sentence under seal.

## STATEMENT OF CASE

On October 6, 2020, the Defendant, Kewan Marquise Shade ("Defendant", "Appellant" or "Mr. Shade"), was indicted in a one-count Indictment filed in the Western District of North Carolina. JA12. The Count charged Mr. Shade with Possession of a Firearm by a Convicted Felon on May 27, 2020, in violation of 18 U.S.C. §922(g).

On August 20, 2021, Kewan Shade filed a Notice of Intent to Change Plea. JA73. A Rule 11 hearing was held before U.S. Magistrate Judge W. Carleton Metcalf on September 3, 2021, but the Defendant was unable to complete the hearing. JA77. A new Notice of Intent to Change Plea was filed on December 17, 2021. JA102. On December 29, 2021, Kewan Shade again appeared before Magistrate Judge W. Carleton Metcalf. He pled guilty without a written Plea Agreement to one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §922(g)(1). JA107; JA134; JA308.

On June 17, 2022, the Defendant filed a sealed sentencing memorandum, JA360, along with an unopposed motion to seal, JA148, and a redacted copy of the sentencing memorandum, JA150. On June 27, 2022, the Court denied the Motion to Seal. JA280

Mr. Shade's sentencing was held on June 27, 2022, before the Honorable Martin K. Reidinger in Asheville, North Carolina. JA210.

At the opening of the Sentencing Hearing, Defendant's Counsel objected to the presentence report regarding: (1) reckless endangerment, JA225; (2) the Defendant's base offense level, JA227; and (3) the criminal history calculation, JA245. The Court overruled all of Defendant's

objections. Defendant's Counsel also argued for a downward variance or departure. JA292. The grounds for this variance were: (1) Lesser Harms (U.S.S.G. §5K2.11); (2) Mental or Emotional Conditions (U.S.S.G. §5H1.3); and (3) Diminished Capacity (U.S.S.G. §5K2.13).

During Mr. Shade's sentencing, the Court first recognized "a great deal of social pressure to try to advocate for… much, much harsher sentences" for "young individuals who have a background of having committed criminal offenses" JA260. Additionally, Judge Reidinger described Defendant's arguments as "very, very technical points." JA265. Judge Reidinger explained he would have imposed the same sentence regardless of the outcome of the arguments on the sentencing guidelines. *Id.* He described the guidelines issues Defendant raised as "the saved-by-the-unicorn argument." JA266. The Court also completely discounted the Defendant's argument raised in his sentencing memo (at JA177) regarding statistics of sentences imposed on defendants charged under the same statute as Mr. Shade. JA268.

The judgment was signed on June 27, 2022. On July 7, 2022, Mr. Shade filed a Notice of Appeal to the United States Court of Appeals for

the Fourth Circuit. JA147, 155. The United States Court of Appeals has jurisdiction pursuant to 28 U.S.C. §1291.

## STATEMENT OF THE FACTS

Kewan Shade has admitted that he was a felon and prohibited from possessing firearms. JA89. On May 27, 2020, Mr. Shade attempted to purchase firearms from an undercover police officer. When officers attempted to make an arrest, Mr. Shade fled to his residence which was 0.8 miles (4,244 feet) away. During the pursuit, Mr. Shade ran two red lights and drove against traffic on the wrong side of the road. JA104. The pursuit ended at Mr. Shade's residence, where the firearms were recovered. JA104-105.

Mr. Shade attempted to purchase the firearms after his family's home was riddled with gunfire. JA153-154. While the gunshots fired at his family's home does not provide a legal excuse for Kewan Shade's offense, it was presented in mitigation to explain his mindset at the time of the offense.

To further understand Kewan's contemporary mindset and mental state, Rob Durr, Ph.D., and licensed psychologist evaluated Defendant Kewan Shade while he was in custody. (JA406-419). As part of the evaluation,

Dr. Durr administered a standardized intelligence test to assess a range of cognitive abilities that represent a sample of what a person has learned and can use at the time of testing. JA409. Dr. Durr diagnosed Kewan Shade with significant mental health issues JA417. This information was shared with the Government and submitted at sentencing.

## SUMMARY OF THE ARGUMENT

Mr. Shade's sentencing suffered significant legal and procedural errors at each stage of the sentencing process. The Court failed to properly determine sentencing under the Guidelines, failed to fully consider Shade's argument for a variance, and failed to apply all portions of 18 U.S.C. §3553. Consequently, the imposed sentence was procedurally unreasonable and legally unsupported.

Further, the Defendant cannot be convicted of possession of a firearm as he has a Constitutional right to bear arms.

Finally, Mr. Shade has a right to present confidential mental health information under seal for mitigation purposes.

## ARGUMENT

I.  The District Court committed significant procedural and legal errors at each stage of sentencing.

    A.  **Standard of Review**

A criminal sentence is reviewed, for reasonableness, "under a deferential abuse-of-discretion standard." *United States v. King*, 673 F.3d 274, 283 (4th Cir. 2008) (internal quotation marks omitted). The first step of the review is to ensure that the district court committed no "significant procedural error." *United States v. Evans*, 526 F.3d 155, 161 (4th Cir. 2008). *See also United States v. Bell*, 667 F.3d 431, 440 (4th Cir. 2011). Procedural errors include "(1) imposing a sentence based on clearly erroneous facts; (2) failing to explain the sentence adequately; or (3) failing to address the defendant's nonfrivolous arguments." *United States v. Lewis*, 958 F.3d 240, 243 (4th Cir. 2020) (internal quotation marks omitted), quoting *Gall*, 552 U.S. at 51, 128 S.Ct. at 596, 169 L.Ed.2d at 457-58 and *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009). "A district court is required to provide 'an individualized assessment' based on the facts before the court." *United States v. Lewis*, 958 F.3d 240, 243 (4th Cir. 2020).

Further, sentences should be reversed when the district court was "guided by erroneous legal conclusions." *Id. United States v Pearce*, 191 F.3d 488, 492 (1999). "[I]f the issue turns primarily on the legal interpretation of a guideline term, the standard moves closer to *de novo*

review." *United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013), quoting *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir. 1989) (internal ellipses removed) (citations removed).

If the sentence is based on proper legal interpretation of the guidelines and is procedurally reasonable, the substantive reasonableness of the sentence is reviewed under an abuse-of-discretion standard, taking into account the totality of the circumstances. *Gall*, 552 U.S. at 51, 128 S.Ct. at 596, 169 L.Ed.2d at 457-58.

## B.    Required Procedure at Sentencing

Since *United States v. Booker*, 543 U.S. 220, 244, 259-60, 264, 125 S.Ct. 738, 756, 764, 767, 160 L.Ed.2d 621, 650, 660, 662 (2005), district courts have been required to consult the non-binding Guidelines and must also consider all of the factors set forth in §3553(a) to guide exercise of their discretionary powers at sentencing. *Id.*, 543 U.S. at 244, 259-60, 264, 125 S.Ct. at 756, 764, 767, 160 L.Ed.2d at, 650, 660, 662.

Subsequent decisions of the United States Supreme Court clarified the role of the Guidelines in sentencing procedures. *See*, *i.e.*, *Peugh v. United States*, 569 U.S. 530, 536, 133 S.Ct. 2072, 2080, 186 L.Ed.2d 84, 95 (2013). First, "a district court should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (citation omitted).  The district court must then consider the arguments of the parties and the factors set forth in §3553(a).  *Id.*, at 49-50, 128 S.Ct. 586, 169 L.Ed.2d 445.

In order to properly determine the Defendant's recommended guidelines sentence and to consider the 18 U.S.C. §3553 factors to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of the sentence statute, the sentencing court must undertake three steps in the sentencing process.  First, the court must determine the Base Offense Level, apply adjustments as appropriate related to victim, role, and obstruction of justice, determine criminal history, and ultimately determine initial guidelines range.  Second, the Court must consider Departures and other Specific Offender Characteristics.  Finally, after the Departures are completed, the Court considers the "applicable factors in 18 U.S.C. §3553(a) taken as a whole." U.S.S.G.

§1B1.1(c). The District Court in this case committed errors during each stage.

## C. The District Court failed to properly determine the initial guidelines range

The issue related to crime of violence involve a question of legal interpretation of the guidelines and the statutes, so a de novo review would apply in these matters. *Steffen*, 741 F.3d at 414, quoting *Daughtrey*, 874 F.2d at 217. Meanwhile the issue of reckless endangerment involves a question that "turns primarily on a factual determination, an appellate court should apply the 'clearly erroneous' standard." *Id.* (internal ellipses removed) (citations removed).

The Guidelines sentence adopted at the sentencing was based upon a total offense level of 23 and a criminal history category of III, yielding the guideline imprisonment range of 57 months to 71 months. That sentence included a two-level enhancement for firearm quantity, a two-level enhancement for a stolen firearm, and two-level adjustment for reckless endangerment during flight (U.S.S.G. §3C1.2).

### 1. Crime of Violence: Base offense level

The Defendant was assigned a base offense level of 20 under U.S.S.G. §2K2.1(a)(4)(A) for his conviction of felon in possession of a

firearm, because the offense was committed "subsequent to sustaining one felony conviction of… a crime of violence." JA315. The prior conviction was Assault with a Deadly Weapon with Intent to Kill (ASWDWITK) in Buncombe County in 2013. JA317, ¶26. Without a prior felony conviction for a crime of violence, the Defendant's base offense level would be a 14. U.S.S.G. §2K2.1(a)(6)(A).

"Crime of violence" in the Guidelines is defined through either the enumerated offenses clause or the elements clause. In this case, both clauses require the same categorial approach analysis. The categorical approach focuses on the elements of the prior offense rather than the conduct underlying the conviction." *United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019) (internal quotations omitted). "Under this approach, if the offense can be committed without satisfying the definition of crime of violence, then it is overbroad and not a categorical match." *United States v. Simmons*, 917 F.3d 312, 316-17 (4th Cir. 2019) (quotations omitted).

## Enumerated Offenses Clause

The Enumerated Offenses Clause, U.S.S.G. §4B1.2(a)(2) includes the generic crime of aggravated assault. The process for determining

whether North Carolina crime of AWDWITK is a categorical match for the general crime of aggravated assault, we look only to the elements of AWDWITK and not the particular facts of Shade's case. *Id.*

"First, we must determine the generic, contemporary meaning of the crime, which will typically correspond to the sense in which the term is now used in the criminal code of most states. The generic definition may be gleaned from the Model Penal Code, modern criminal law textbooks, or from a survey of the states' definitions of the crime." *Id.*, 917 F.3d at 317 (quotations and citations omitted). The Model Penal Code provides that "a person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon." Id., at 318 (4th Cir. 2019) (emphasis omitted), citing Model Penal Code §211.1(2).

After the generic definition is determined, the Court must decide whether the elements of the prior conviction, AWDWITK, categorically match the elements of the generic offense. *Id.*, 917 F.3d at 317. There is

"a categorical match if the least culpable conduct punished by the state criminal statute falls within the scope of the generic offense." *Id.*, 917 F.3d at 317.

## Elements Clause

In addition to the delineated offenses in U.S.S.G. §4B1.2(a)(2), the term "crime of violence" also includes "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—(1) has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. §4B1.2(a)(1)[1]. "Use of force means to act with a mens rea more culpable than negligence or recklessness." *United States v. Townsend*, 886 F.3d 441, 444-45 (4th Cir. 2018).

Relation to the residual clause of U.S.S.G. §4B1.2(a) is also examined using the categorical approach. As explained by the Fourth Circuit,

> We accordingly identify the elements of [the Defendant's] predicate offense and determine whether they necessarily fit within the definition set out in §4B1.2(a)(1). A predicate offense qualifies as a crime of violence if all of the conduct criminalized by the statute—"including the most innocent

---

[1] Similar language is used in Armed Career Criminal Act, 18 U.S.C. §924(e) (2012).

conduct"—matches or is narrower than the Guidelines' definition of "crime of violence."

If, however, the predicate offense can be committed without satisfying the definition of "crime of violence," then it is overbroad and not a categorical match.

*United States v. Salmons*, 873 F.3d 446, 448 (4th Cir. 2017) (internal citations omitted). The same issues of the definition of "Assault" in North Carolina law affects both clauses.

## Lack of Intent Requirement in North Carolina Law

Both the enumerated offenses of Aggravated Assault and the elements clause suffer from the same defects when Assault with a Deadly Weapon with Intent to Kill (AWDWIK) is examined under the categorical approach.

The elements of AWDWITK are: "(1) an assault; (2) with a deadly weapon; (3) with the intent to kill." *State v. Garris*, 191 N.C. App. 276, 663 S.E.2d 340, 349 (N.C. Ct. App. 2008) (internal quotation marks and alteration omitted); see N.C. Gen. Stat. §14-32(c)(2017). Assault is not defined by statute in North Carolina; instead, it is defined by common law. *State v. Roberts*, 270 N.C. 655, 658, 155 S.E.2d 303, 305 (1967). An assault is an overt act or an attempt, or the unequivocal appearance of an attempt, with force and violence, to do some immediate physical injury

to the person of another, which show of force or menace of violence must be sufficient to put a person of reasonable firmness in fear of immediate bodily harm." *Id.*

The Model Penal Code's definition of an aggravated assault requires an actual "attempt[] to cause serious bodily injury" under the enumerated offenses clause of the Guidelines' crime of violence. The inclusion of an "unequivocal appearance of an attempt" means that the first North Carolina form of an Assault (and by extension the assault element of an AWDWITK) is "overbroad and not a categorical match" for the enumerated offenses under *Simmons*, 917 F.3d at 316-17.

Further, as the Fourth Circuit explained in *United States v. Vinson*, 805 F.3d 120, 126 (4th Cir. 2015), "North Carolina law permits convictions for all forms of assault, including completed-battery assault, in cases where the defendant's conduct does not rise even to the level of recklessness."[2] A deadly weapon is "any article, instrument or substance

---

[2] In an unpublished *per curium* opinion, this Court determined that a Defendant could not establish as plain error that the district court incorrectly concluded that his prior conviction for North Carolina assault with a deadly weapon with intent to kill (AWDWITK) is a crime of violence for purposes of U.S. Sentencing Guidelines Manual §§2K2.1(a)(4)(A), 4B1.2(a) (2014). *United States v. Vereen*, 703 F. App'x 171 (4th Cir. 2017).

which is likely to produce death or great bodily harm." *State v. Bagley*, 321 N.C. 201, 212, 362 S.E.2d 244, 251 (1987).

North Carolina courts consistently have observed that AWDWIK "has, as an element, specific intent to kill." *State v. Coble*, 351 N.C. 448, 527 S.E.2d 45, 49 (N.C. 2000). However, the North Carolina Supreme Court has suggested that "culpable or criminal negligence may be used to satisfy the intent requisite for certain dangerous felonies, such as manslaughter, _assault with a deadly weapon with intent to kill_ and AWDWISI." *State v. Jones*, 353 N.C. 159, 166, 538 S.E.2d 917, 923 (N.C. 2000), *citing State v. Eason*, 242 N.C. 59, 65, 86 S.E.2d 774, 778; *State v. Sudderth*, 184 N.C. 753, 755, 114 S.E. 828, 829 (1922). (emphasis added)[3]

---

[3] Several courts have addressed a similar *Jones* argument and held that it did not affect the *mens rea* required to prove intent to kill. See, e.g., *United States v. Townsend*, 886 F.3d 441, 447 (4th Cir. 2018) (declining to rely upon the language from *Jones* because it was dicta); *United States v. Vereen*, 703 F. App'x 171 (4th Cir. 2017) (holding that assault with a deadly weapon with intent to kill ("AWDWITK") was a crime of violence under the U.S. Sentencing Guidelines because it had a specific intent to kill and rejecting a similar Jones argument). But cf. *United States v. Brown*, 249 F. Supp. 3d 287, 298-99 (D.D.C. 2017) ("Because a North Carolina AWDWITK conviction can be obtained by a mere showing of culpable or criminal negligence, it does not qualify as a "violent felony" under ACCA's elements clause" citing *Jones*).

Together, *Vinson* held that assault may be proven with culpable negligence in North Carolina and *Jones* held that intent to kill only requires proving culpable negligence. Therefore, Assault with a Deadly Weapon with Intent to Kill under North Carolina law is not a "crime of violence. Therefore, in North Carolina, the Defendant's predicate offense of Assault with a Deadly Weapon with Intent to Kill, in a violation of N.C.G.S. §14-32(c), does not require the specific intent involving the use, attempted use, or threatened use of physical force against the person of another.

### Lack of Requirement for Communicated Threat in North Carolina Law

The Supreme Court's recent decision in *United States v. Taylor*, __ U.S. ___, 142 S.Ct. 2015, 213 L.Ed.2d 349 (June 21, 2022)[4], rejected a broader view of a "threat of force" under a Federal elements clause, where the threat includes "a more objective or abstract risk" (e.g., "a critic might say that a prison board's decision to parole a particular felon 'threatens' community safety'"). *Id.*, __ U.S. ___, 142 S.Ct. at 2023, 213 L.Ed.2d at

---

[4] *United States v. Taylor* involved a Hobbs Act Robbery and upheld a prior 4th Circuit decision, 979 F.3d 203 (2020). The Supreme Court opinion greatly expanded this court's reasoning.

359. The Court determined that the "threatened use of physical force against the person or property of another" requires "a communicated threat." *Id.*, __ U.S. ___, 142 S.Ct. at 2024, 213 L.Ed.2d at 360. It requires proof "that the defendant communicated a threat to a second person, whether or not that individual is the target of the threat." *Id.*, __ U.S. ___, 142 S.Ct. at 2023, 213 L.Ed.2d at 359.

This leads to the question of whether the "unequivocal appearance of an attempt" as an sufficient element of assault in North Carolina requires a "communicated intent to inflict physical or other harm on any person or on property" by the Defendant "to a second person, whether or not that individual is the target of the threat." *Id.*, __ U.S. ___, 142 S.Ct. at 2024, 213 L.Ed.2d at 360.

Black's Law Dictionary defines "Communication" as "[t]he interchange of messages or ideas by speech, writing, gestures, or conduct; the process of bringing an idea to another's perception." Black's Law Dictionary, 11th ed., at 348. The American Heritage College Dictionary similarly defines "communication" as "[t]he exchange of thoughts, messages, or information." See American Heritage College Dictionary, 3rd ed., p. 282. Unless a person's message is both transmitted by the

person and received by another person, the person has not communicated.

This requirement of transmittal **and** receipt of a threat for a crime of violence creates an issue under North Carolina law, where it is not necessary that the victim actually be placed in fear for an assault to be committed; it is enough if the act was sufficient to put a *reasonable person* in fear of immediate bodily harm. *State v. Starr*, 209 N.C. App. 106, 703 S.E.2d 876 (2011). Because it considers the state of mind of a reasonable person, not an actual person, it is possible to commit an assault through an "unequivocal appearance of an attempt" where the threat is not received or understood by the victim or a third party. In that situation, the threat was not communicated to a second person. Therefore, this form of Assault is overly "overbroad and not a categorical match."

After *United States v. Taylor*, if a Defendant can point to a hypothetical set of facts which would satisfy the elements of the offense without constituting a crime of violence, the offense is not a crime of violence and the enhancement would not apply. ___ U.S. at ___, 142 S. Ct. 2015, 2024, 213 L.Ed.2d 349, 361. To constitute an assault without

being a crime of violence, the hypothetical would need to either have a (1) unequivocal appearance of an attempt to immediately physically injure another person that a reasonable person would fear but where the threat is not actually received or understood by a second person. As an example:

> Suppose Adam, the owner of a gun store who spent 20 years in the Marine Corps is cleaning a firearm while Dave is the only would be customer in the store watching him. Before leaving the firearm on the counter, Adam intentionally leaves the firing pin out of the firearm, rendering it unable to fire. Adam walks across the store and Dave picks up the gun and says, "I'm going to kill you if you don't empty the cash register." No matter Adam's response, Dave intends to kill Adam and rob the store of money and guns. Any reasonable person would be afraid of physical harm in Adam's position. However, Adam thinks Dave saw him take out the firing pin, so he assumes he is just joking around. Adam raises his hands mockingly and laughs aloud. This laughter unnerves the Dave who changes his plan, throwing the gun down and running out of the store.

In this hypothetical, the customer has satisfied all the elements of Assault with a Deadly Weapon with Intent to Kill. He has not used or even attempted to use force and his threat of force was not communicated to Adam or anyone else. This hypothetical shows a crime of Assault with a Deadly Weapon with Intent to Kill, which does not qualify as crime of violence after *United States v. Taylor*.

Finally, prior cases from this Court have focus on the intent element in AWDWIK as *per se* evidence of a crime of violence. However, the Supreme Court in *Taylor* rejected any consideration of the Defendant's intent in the "categorical approach" analysis of crimes of violence. *Id.*, __ U.S. ___, 142 S.Ct. at 2020, 213 L.Ed.2d at 357.

Based upon this reasoning, AWDWIK should not be a crime of violence under U.S.S.C. §2K2.1(a)(4)(A) and the Defendant should be sentenced at the base offense level of 14.

### 2. Reckless Endangerment During Flight

The Presentence Investigation indicated that "According to discovery, SHADE ran a red light, passed stopped traffic by driving against the flow of traffic on the wrong side of the road, and ran another red light during his flight from law enforcement." (Doc #54, ¶31). It imposes a 2-point enhancement pursuant to U.S.S.G. §3C1.2 based on the determination that "The defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." (Doc #54, ¶31).

Under the U.S.S.G. §3C1.2, a two-level enhancement is applied if "the defendant recklessly created a substantial risk of death or serious

bodily injury to another person in the course of fleeing from a law enforcement officer." "Reckless" is defined in the Commentary to §2A1.4 as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." The commentary gives the example of "A homicide resulting from driving a means of transportation, or similarly dangerous actions, while under the influence of alcohol or drugs...." U.S.S.G. §2A1.4, cmt. n.1. The alleged actions of the Defendant are not analogous to a homicide resulting from driving car while under the influence of alcohol or drugs.

The Guidelines do not define "substantial risk." The Fourth Circuit recently determined that §3C1.2 does not categorically apply to high-speed chases. *United States v. Burnley*, 988 F.3d 184, 191 (4th Cir. 2021). The enhancement only applies when sufficient, additional facts demonstrated substantial risk. *Id.* Examples of these additional facts include fleeing a traffic stop when the officers were close enough that the Defendant's car rolled over one officer's foot when he suddenly pulled away, *Id.*; actual injury to an officer, *United States v. Hale*, 834 Fed.

Appx. 789 (4th Cir. 2020) (per curium); or striking two vehicles while fleeing, *United States v. Bouler*, 351 F. App'x 822, 824 (4th Cir. 2009) per curiam). None of these actions are present in this case. The enhance should not have been applied.

**D.    The District Court failed to properly consider Departures and other Specific Offender Characteristics**

Once the Court determined the non-binding guidelines sentence, it should have considered the Defendant's arguments for departures and other specific offender characteristics. There are a number of Guidelines policy statements and issues applicable to this case which warrant consideration for a downward departure. Where the Courts finds that the facts of this case are insufficient to warrant a specific downward departure, these matters taken together justify a variance and a reduced sentence by the Court.

Under U.S.S.C. §5K2.13, "Diminished Capacity," the Guidelines suggest, "A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. §5K2.13. This must be tempered to the extent "(2) the facts and

circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence," or "(3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public." *Id.* The extent of any "departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." *Id.*

In this case, Dr. Durr's evaluation demonstrated that Mr. Shade suffers from a diminished capacity, processing information at a significantly slower pace and likely somewhat less efficiently when compared to most peers his age. He scored lower than 99 percent of his peers.

Considered in the context of a relatively complex issue of duress, this slower and less efficient information processing likely contributed to Kewan Shade's contemporaneous decision to illegally possess firearms. Removed in time and location, he has had opportunity to adequately process these issues more thoroughly. He understands and articulates that he made the wrong decision to possess firearms as a felon instead of relying upon law enforcement to protect his family.

Under U.S.S.G. §5H1.3, the guidelines explain "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. §5H1.3. Based upon the report of Dr. Durr, mental and emotional conditions are present in this case. The depression and anxiety felt by the Defendant after his offense are present to an unusual degree. This depression and anxiety are directly related to the Defendant's experience of "self-criticalness" and "self-disgust." This experience demonstrates the Defendant's self-examination of his criminal conduct and shows genuine regret for his actions. It suggests that greater rehabilitation of this Defendant should take a reduced time period.

The court addressed the Defendant's "Diminished Capacity" and his "Mental and Emotional Conditions" together. The Court indicated that it applied these departures but failed to articulate the effect the Departures had on his sentence, except that it was "a mitigating factor that has brought me to as low a sentence as I did." JA269. In this aspect, the Court failed "to explain adequately the sentence imposed 'to allow for

meaningful appellate review and to promote the perception of fair sentencing.'" *Lewis*, 958 F.3d at 243, *quoting Gall*, 552 U.S. at 50, 128 S.Ct. at 597, 169 L.Ed.2d at 457.

Under U.S.S.G. §5K2.11, "Lesser Harms," the Guidelines explain, "Where a defendant may commit a crime in order to avoid a perceived greater harm…, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct." U.S.S.G. §5K2.11. The Defendant criminally possessed a firearm to protect his family after a shooting at his family's home. The need for punishment or deterrence of the behavior is reduced in these circumstances.

The Court discounted the effect of this departure for lesser harms arguing that the Defendant already had a gun and did not need another. JA267-268. Nevertheless, the actions of the Defendant were less culpable than a felon who possesses a firearm for criminal gain or in furtherance of another criminal offense. The need for punishment or deterrence of the behavior is reduced in these circumstances.

As the Guidelines explain under U.S.S.C. §5K2.12, "Coercion or Duress," if the defendant committed the offense because of serious

coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Despite criminal prohibitions on possessing a firearm, the Defendant was driven by a misguided need to protect his family whose house had been shot up by an unknown assailant. The Court did not even consider this departure.

E. **The District Court failed to properly apply the "applicable factors in 18 U.S.C. §3553**

Once it determines a guideline sentence and evaluates the Defendant's arguments for departures, the district court must turn to the 18 U.S.C. §3553(a) factors to determine a reasonable sentence. As this Court explained, "As is well understood, to meet the procedural

reasonableness standard, a district court must conduct an individualized assessment of the facts and arguments presented and impose an appropriate sentence, and it must explain the sentence chosen." *United States v. Nance*, 957 F.3d 204, 212 (4th Cir. 2020) (internal citations and quotations omitted). "Specifically, a district court's explanation should provide some indication that the court considered the §3553(a) factors and applied them to the particular defendant." *Nance*, 957 F.3d at 212-13 (internal citations and quotations omitted); *United States v. Montes-Pineda*, 445 F.3d 375, 380 (4th Cir. 2006).

      1.    **Consideration of Sentencing Statistics to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

In this case, the Defendant advocated consideration sentencing statistics promulgated by the United States Sentencing Commission, within its statutory authority. The statistics were provided to help the Court "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" under 18 U.S.C. §3553(a)(6).

The Sentencing Commission has determined that the average sentence for the 6,782 federal defendants sentenced for violations of 18

U.S.C. §922(g) (usually a felon in possession of a firearm) in fiscal year 2020, was 56 months if the Armed Career Criminal Act (ACCA) did not apply, less than the Court's sentence in this case.

Of all defendants, nearly 44% received a sentence below the guidelines, with more than 4% receiving a downward departure and 34% receiving a downward variance, with an average reduction of nearly one-third of the guidelines sentence. Only 3.7% of the offenders received a sentence above the guidelines range.[5]

The Western District of North Carolina sentences firearm offenses more strictly than Federal Courts nationally. Nationally, the mean sentence was 48 months of incarceration and a median of 37 months. In WDNC, the mean was 55 months and the median was 49 months. Nationally, less than 52% of the sentences for firearms offenses are within the guidelines, while 70% of firearms sentences in the Western District are within the guidelines. Nationally, Federal Courts were more than five times more likely to grant a non-governmental motion for departure in all crimes than the judges of the Western District. Overall,

---

[5] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY20.pdf

judges in other districts are four times more likely to grant a downward departure for firearms offenses than the judges of the Western District.[6]

The Defendant was sentenced to 60 months. The Court explained that this matter was "very much a heartland case," suggesting that the Defendant should receive an average sentence. JA269. However, based on these statistics, the sentence received by the Defendant was not within the "heartland" of sentences given by Courts around the country for this offense. Rather, the Defendant was sentenced to longer term of imprisonment because he was sentenced in the Western District of North Carolina.

Judge Reidinger dismissed the importance of the statistics promulgated by the United States Sentencing Commission, explaining "I discount that sort of statistical information because each of those cases is different, each of those defendants is different. There are some of those defendants who deserve sentences much longer than this; there are others who have circumstances that deserve a shorter sentence than this. So those statistics don't really mean anything, so that has been

_____

[6] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/ncw20.pdf

discounted, as well." JA269. This creates a sentence that is procedurally unreasonable.

2. **Application of the Guidelines in fashioning a sentence under 18 U.S.C. §3553**

In a startling admission, the Court at sentencing admitted that the actual determination of the guidelines sentence would have no effect on the sentence he imposed. The Court describes the guidelines issues raised by the Defendant as "the saved-by-the-unicorn argument." JA265-266. He characterized those arguments raised as "very, very technical points." JA265.

The Court further explained,

It is because those arguments are so technical in nature -- with regard to procedure of whether something is to be considered in part one of the hearing or part two -- that I have come to the conclusion that, even if I had sustained every one of the defendant's objections on those technical points, my sentence would be exactly the same because, first of all, a number of those points that were being made have great gravity when it comes to Section 924 or an ACCA revision or something like that, but that's not what we're doing here today.

JA265. In fact, the Court seems to suggest that the examination of the guidelines provisions under a categorical approach is unwarranted. "Today, here, under 4B1.2, they're supposed to give guidance, and

guidance is supposed to be based on facts, and the facts are what the facts are, not some hypothetical." JA265.

Despite the forthright tone of this rhetoric, the statute requires that the Court shall consider "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission." 18 U.S.C. §3553(a)(4)(a)(i). This includes considering the guidelines determination that a particular prior offense is not a "crime of violence" under the guidelines' categorical approach. The Court's admission as to its sentencing analysis is not supported by the precedents of this Court and represents a practical failure "to address the defendant's nonfrivolous arguments" under *Lewis*, 958 F.3d at 243.

## II.    The Defendant has the right to bear arms under the Second Amendment

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, ___ U.S. ___, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), the Supreme Court rewrote the test for determining whether a firearm law violates the Second Amendment. Previously, courts of appeals had determined whether such a law is constitutional by applying a two-step test. Under the first step,

courts determined whether the law was consistent with analogous gun restrictions from the Nation's founding and early history.  If it was, the law passed constitutional muster.  But if it was not, the law could still survive if the government's interest in the restriction outweighed the infringement on the individual.

*Bruen* got rid of the second step.  It held that "a constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Bruen*, ___ U.S. at ___, 142 S.Ct. at 2129, 213 L.Ed.2d at 409 (quotations omitted).   So for a law to survive a Second Amendment challenge, the government must still "identify an American tradition" justifying the law's existence under the first step. But if it cannot, courts may no longer apply a "means-end scrutiny" to uphold the law under the second step. *Id.* ___ U.S. at ___, 142 S.Ct. at 2125, 2138, 2135, 213 L.Ed.2d at 405, 418-19.  Instead, the inquiry ends, and the law is unconstitutional.

*Bruen* abrogated over a decade of precedent rejecting Second Amendment challenges.  One of these challenges involves person convicted of a felony who possesses a firearm under 18 U.S.C. §922(g)(1). Here, as in *Bruen*, the government cannot meet its burden to show a

historical tradition of restricting people with felonies from possessing firearms. From 17th-century England through Reconstruction, there is no historical analogue of disarming whole swaths of the populace simply because they had a past conviction. To the contrary, early Americans used targeted regulations to prevent dangerous people from committing crimes with guns. (And even people feared to be dangerous generally could still keep firearms for self-defense.) In some instances, state courts and Congress recognized that permanent disarmament—even of those who committed treason—was incompatible with the traditional right to bear arms. In this case, the Defendant has clearly articulated his need to possess firearms for self-defense after his family's home was riddled by gunfire.

Going forward, *Bruen* provides the only relevant test for determining whether a gun law is constitutional. As one Supreme Court Justice has noted, no historical tradition of prohibiting felons from possessing firearms exists. *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, ___ U.S. ___, 142 S.Ct. 2111, 213 L.Ed.2d 387. And because a firearms regulation can no

longer be upheld under a "means-end scrutiny," the inquiry ends.  Thus, §922(g)(1) is unconstitutional.

### A. *Bruen* adopted a new approach to the Second Amendment, overruling contrary Fourth Circuit precedent

#### 1. *Bruen* overhauled the test for determining whether government action infringes on the right to keep and bear arms

The Second Amendment states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  That codified people's pre-existing right to defend themselves from dangers inherent to living among others. *Bruen*, ___ U.S. at ___, 142 S.Ct. at 2128, 2135, 213 L.Ed.2d at 407-408, 415.  *Bruen* compels the conclusion that §922(g)(1) impermissibly infringes upon that right.  That is not an accident.  After all, "[f]elons may need arms for lawful self-defense just as much as the rest of us do." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1499 (2009).

To determine whether government action infringes on the Second Amendment, the Fourth Circuit and other federal courts of appeals have applied a two-step test. *See United States v. Carpio-Leon*, 701 F.3d 974, 976 (4th Cir. 2012) (discussing cases).  The Fourth Circuit considers such

constitutional challenges de novo. *United States v. Pruess*, 703 F.3d 242, 245 (4th Cir. 2012) *citing United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012).

Under this two-step test, the first question was "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (quotations omitted). As this Court explained, "This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid." *Id.* at 680 (internal citations omitted).

If the law burdened conduct covered by the Second Amendment, courts then "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id.* The level of scrutiny applied depended on "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 682 (quotations omitted). This could vary between intermediate and strict scrutiny but required more than rational basis. *See id.* (citing *Heller*, 554 U.S. at 628 n.27). So at a minimum, courts always assigned *some* weight to the government's

interest in public safety and "keeping firearms away from individuals with a demonstrated history of actual or attempted assaultive violence." *Id.* at 691.

Recently, the Supreme Court held that this second step was "one step too many" because only constitutional text and history can justify a firearms regulation. *Bruen*, ___ U.S. at___, 142 S.Ct. at 2127, 213 L.Ed.2d at 406-407. In *Bruen*, the Supreme Court analyzed whether a New York law allowing state authorities to deny gun licenses for lack of "proper cause" violated the applicants' Second Amendment rights. *Id.* ___ U.S. at___, 142 S.Ct. at 2123, 213 L.Ed.2d at 402. *Bruen* considered whether such laws violate the Second Amendment.

*Bruen* began by affirming the first step: that courts examine "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Id.* ___ U.S. at___, 142 S.Ct. at 2127-2128, 213 L.Ed.2d at 407-408 (quotations omitted). This methodology "center[s] on constitutional text and history." *Id.* ___ U.S. at___, 142 S.Ct. at 2128–29, 213 L.Ed.2d at 408-409. Initially, the court must determine whether the individual's conduct falls within "the Second Amendment's plain text."

*Id.* ___ U.S. at___, 142 S.Ct. at 2126, 213 L.Ed.2d at 405. If it does, then the conduct is "presumptively" constitutional and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* ___ U.S. at___, 142 S.Ct. at 2130, 2126, 213 L.Ed.2d at 409-410, 405. This inquiry requires an examination of the nation's "well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* ___ U.S. at___, 142 S.Ct. at 2138, 213 L.Ed.2d at 418.

But *Bruen* then declined to conduct the second step, stating that the Court's prior decision in *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 2816-2817 171 L.Ed.2d. 637, 678 (2008), did not support "applying means-end scrutiny in the Second Amendment context." *Bruen*, ___ U.S. at___, 142 S.Ct. at 2127, 213 L.Ed.2d at 407. The Court explained that "[t]he Second Amendment is the very product of an interest balancing by the people" and thus "demands our unqualified deference." *Id.* ___ U.S. at___, 142 S.Ct. at 2131, 213 L.Ed.2d at 410-411 (quotations and emphasis omitted). So even if a firearm restriction *could* satisfy an "interest-balancing inquiry," the "very

enumeration of the right takes [it] out of the hands of government." *Id.*
___ U.S. at___, 142 S.Ct. at 2129, 213 L.Ed.2d at 408 (quotations omitted). Thus, the "second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id.* ___ U.S. at___, 142 S.Ct. at 2129, 213 L.Ed.2d at 409.

Having dismissed the second step, *Bruen* provided guidance on conducting the first-step historical analysis. The Court considered "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* But *Bruen* reminded that "not all history is created equal." *Id.* ___ U.S. at___, 142 S.Ct. at 2136, 213 L.Ed.2d at 416. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* (quotations omitted). Because the Second Amendment was adopted in 1791, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* ___ U.S. at___, 142 S.Ct. at 2137, 213 L.Ed.2d at 417. (quotations and emphasis omitted).

*Bruen* also offered analytical guidance for evaluating historical clues. In particular, *Bruen* drew a distinction between two types of regulation. On the one hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." *Id.* ___ U.S. at___, 142 S.Ct. at 2131, 213 L.Ed.2d at 411. Courts should begin by deciding whether "a distinctly similar historical regulation address[ed] the problem." *Id.* If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation may violate the Second Amendment. *Id.* Likewise, if earlier generations rejected comparable regulations as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.* In contrast, if a regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the "historical inquiry . . . will often involve reasoning by analogy." *Id.* ___ U.S. at___, 142 S.Ct. at 2132, 213 L.Ed.2d at 412.

In either case, the burden falls squarely on the government to "affirmatively prove that its firearms regulation is part of the historical

tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* ___ U.S. at___, 142 S.Ct. at 2127, 213 L.Ed.2d at 406. If the government cannot do so, the infringement cannot survive.

Employing these tools, *Bruen* concluded that New York's law fell under the first category. It implicated a societal problem dating back to the founding: "handgun violence, primarily in urban areas." *Id.* ___ U.S. at___, 142 S.Ct. at 2131, 213 L.Ed.2d at 387 (simplified). Thus, there was no need for analogical reasoning and the government bore the burden to show a "comparable tradition of regulation" from the founding era. *See id.* The government, however, had not "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense *Id.* ___ U.S. at___, 142 S.Ct. at 2138, 213 L.Ed.2d at 419. At most, the government had shown restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id.* ___ U.S. at___, 142 S.Ct. at 2143, 213 L.Ed.2d at 424. Thus, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id.* ___ U.S. at___, 142 S.Ct. at 2154, 213 L.Ed.2d at 436.

As *Bruen* summarized, the "standard for applying the Second Amendment" now requires courts to do the following:

- If the Second Amendment's "plain text" covers an individual's conduct, courts must presume the Constitution "protects that conduct";

- To rebut this, the government must show that any restriction is "consistent with the Nation's historical tradition of firearm regulation";

- If the government cannot do so, the law is unconstitutional.

*Id.* ___ U.S. at___, 142 S.Ct. at 2129-2130, 213 L.Ed.2d at 409.

Accordingly, *Bruen* requires courts to revisit any Second Amendment decision not consistent with this methodology.

    2.    ***Bruen*** **also abrogated prior case law relying on "presumptively lawful" exceptions to the Second Amendment**

Where prior Fourth Circuit authority relies upon a reading of Supreme Court precedent, "which later Supreme Court decisions have shown is untenable," the Fourth Circuit authority "is not a viable authority and should no longer be followed." *Faust v. S.C. State Highway Dep't*, 721 F.2d 934, 940 (4th Cir. 1983). The Courts are not bound to follow the holding of a Fourth Circuit case "is clearly undermined by [ ] more recent Supreme Court decisions." *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998). To determine whether a prior opinion was effectively overruled, courts look not only to "'the holdings of higher

courts' decisions'" but also their "'mode of analysis.'" Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)).

Of course, lower courts should "give great weight to Supreme Court dicta," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Court's opinion engages in an "extended discussion" of an issue, the Court gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021).

*Bruen* is clearly irreconcilable with prior Fourth Circuit precedent that applied a "means-end scrutiny." *See Carpio-Leon*, 701 F.3d at 978; *Chester*, 628 F.3d at 680;

But *Bruen* is also clearly irreconcilable with prior precedent holding that *Heller*'s list of "presumptively lawful" firearms restrictions automatically controls absent a full historical analysis. *See, e.g., United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012) (relying on *Heller*'s "presumptively lawful" language to deny a Second Amendment challenge to §922(g)(13)).

In *Heller*, the Supreme Court confirmed an individual's right to keep and bear arms but cautioned that this right is "not unlimited." 554

U.S. at 626, 128 S.Ct. at 2816, 171 L.Ed.2d. at 678. As an example, the Court provided a non-exhaustive list of "*presumptively* lawful regulatory measures"—i.e., ones that had not yet undergone a full historical analysis. *Id.* 554 U.S. at 627 n.26, 128 S.Ct. at 2817 n.26, 171 L.Ed.2d. at 678 n.26 (emphasis added). This list included laws restricting possession by felons and the mentally ill and the carrying of firearms in "sensitive places." *Id.* 554 U.S. at 626, 128 S.Ct. at 2816-2817, 171 L.Ed.2d. at 678. But it also included "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment or state analogues." *Id.* Elsewhere, *Heller* confirmed this historical regulation of concealed-carry laws, pointing to multiple state Supreme Court decisions holding that the "constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." *Id.* 554 U.S. at 613, 629, 128 S.Ct. at 2809, 2818, 171 L.Ed.2d. at 670, 679.

But *Heller* emphasized that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* And since this was the Court's "first in-depth examination of the Second Amendment," *Heller* explained that it could not "clarify the entire field."

*Id.* 554 U.S. at 635, 128 S.Ct. at 2821, 171 L.Ed.2d. at 683. But *Heller* promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.*

Fourteen years later, *Bruen* then undertook an "exhaustive historical analysis" of a state licensing regime regulating both open and concealed carrying of firearms." *Id.* ___ U.S. at ___, 142 S.Ct. at 2123, 312 L.Ed.2d at 402. While acknowledging *Heller*'s preliminary analysis of concealed-carry laws, *Bruen* then conducted a full historical review and reached a more nuanced understanding of the history surrounding such laws. *See id.*, ___ U.S. at ___, 142 S.Ct. at 2146-2147, 312 L.Ed.2d at 427-428. With this new understanding, it held that New York could not, in fact, issue a blanket prohibition on concealed carry. *Id.* ___ U.S. at ___, 142 S.Ct. at 2156, 312 L.Ed.2d at 438.

Importantly, *Bruen* did not "overrule" *Heller*'s "holding" that concealed-carry laws were presumptively lawful. It merely did what *Heller* promised: conducted an "exhaustive historical analysis" on one of the "exceptions" that had now "come before it." *Heller*, 54 U.S. at 635, 128 S.Ct. at 2821, 171 L.Ed.2d at 683. *Bruen*'s mode of analysis thus shows

that *Heller*'s preliminary list of Second Amendment exceptions do not bind future courts or prevent them from conducting a full historical review that may point to a different conclusion. So as with the New York statute, the application of *Bruen*'s revamped test—rather than *Heller*'s initial presupposition—controls.

This mode of analysis abrogates prior Fourth Circuit case law finding felon-in-possession laws constitutional. *Moore*, the Fourth Circuit rejected a Second Amendment challenge to §922(g)(1) by relying on *Heller*'s "presumptively lawful" language. 666 F.3d 313, 318. Relying on *Moore* the Defendant could not sustain a Constitutional challenge in *United States v. Pruess* because he "cannot rebut the presumption of lawfulness of the felon-in-possession prohibition as applied to him." 703 F.3d 242, 246 (4th Cir. 2012). In *United States v. Smoot*, 690 F.3d 215, (4th Cir. 2012), the Fourth Circuit rejected yet another as-applied challenge to §922(g)(1), based on the Heller's "presumption of lawfulness." *Bruen* now confirms that like the concealed-carry laws that *Bruen* later held unconstitutional, a full historical analysis can rebut *Heller's* "presumptively lawful" exceptions to the Second Amendment. Because *Bruen* abolished this second step and showed that *Heller*'s list

of "presumptively lawful" exceptions are not binding, *Moore*, *Pruess*, *and Smoot* are no longer good law.

## B.    The Second Amendment's plain text covers Kewan Shade's conduct

Kewan Shade's conduct is presumptively lawful because it falls within the Second Amendment's plain text.  The Court's resolution of *Moore's* as applied challenge to 18 U.S.C. §922(g)(1) rested on the conclusion that he was not a "law-abiding, responsible citizen to possess and carry a weapon for self-defense," as defined in *Chester*, 628 F.3d at 683 and *Heller*, 554 U.S. at 635, 128 S.Ct. 2783, 171 L.Ed.2d at 683. Following *Bruen*, felons such as Mr. Shade are "part of 'the people' whom the Second Amendment protects." *Bruen*, ___ U.S. at ___, 142 S.Ct. at 2134, 213 L.Ed.2d at 414 (quoting *Heller*, 554 U.S. at 580, 128 S.Ct. 2783, 171 L.Ed.2d 637). "[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580, 128 S.Ct. at 2790*2791, 171 L.Ed.2d at 650.  Because "felons" are not "categorically excluded from our national community," they fall within the amendment's scope. *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting); *accord Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting).

Comparison to other constitutional amendments confirms this view. As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments." *Id.* 554 U.S. at 580, 128 S.Ct. at 2790*2791, 171 L.Ed.2d at 650 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S.Ct. 1056, 1060, 108 L.Ed.2d 222, 2032 (1990)). It is beyond challenge that felons are among "the people" whose "persons, houses, papers, and effects" enjoy Fourth Amendment protection. Const. Amend. IV. And felons likewise enjoy "the right of the people" to "petition the government for redress of grievances." Const. Amend. I. If a person with a felony conviction is one of "the people" protected by the First and Fourth Amendments, *Heller* teaches that he is one of "the people" protected by the Second Amendment, as well.

Additionally, the Second Amendment's plain text protects Mr. Shade's "proposed course of conduct," *Bruen*, ___ U.S. at ___, 142 S.Ct. at 2134, 213 L.Ed.2d at415, that is, "to possess and carry weapons in case of confrontation.'" ___ U.S. at ___, 142 S.Ct. at 2135, 213 L.Ed.2d at 415 (quoting *Heller*, 554 U.S. at 592, 128 S.Ct. at 2797, 171 L.Ed.2d at 657);

48

*contra* 18 U.S.C. §922(g). Thus, his possession of a firearm for self-defense is "presumptively guarantee[d]," unless the government meets its burden to prove that §922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.*

### C. The government cannot show "an American tradition" that individuals convicted of a felony may not possess a gun

The government cannot meet its burden to establish the requisite historical tradition. As in *Bruen*, the "general societal problem" that §922(g)(1) is designed to address—i.e., felons with access to guns—is one "that has persisted since the 18th century." *Id.* ___ U.S. at ___, 142 S.Ct. at 2131, 213 L.Ed.2d at 411. Thus, §922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation." *Id.* The government cannot meet its burden to establish §922(g)(1)'s historical pedigree for a simple reason: neither the federal government nor a single state barred all people convicted of felonies until the 20th century.[7] *See*, *e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA

---

[7] The first state law to bar the possession of some firearms by felons was enacted in 1914. Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), https://sites.law.duke.edu/secondthoughts/2019/06/27/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/.

L. Rev. 1551, 1563 (2009). The modern version of §922(g)(1) was adopted *177 years* after the Second Amendment—far too recently to alter the Amendment's meaning. *Bruen*, ___ U.S. at ___ n.28, 142 S.Ct. at 2154, 213 L.Ed.2d at 436 ("[L]ate-19th-century evidence" and any "20th-century evidence... does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Section 922(g)(1) very much contradicts earlier evidence from the relevant historical periods that lack evidence of any analogue to §922(g)(1).

### 1. Forever depriving all felons of their right to bear arms does not comport with English history

England, before the Founding, did not ban felons from ever again possessing a firearm. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020). To the extent that England sought to disarm various individuals, those regulations usually required a more culpable mental state and made exceptions for self-defense, both features absent from §922(g)(1). In other words, they are

not "distinctly similar" to modern felon-in-possession laws. *See Bruen*, ___ U.S. at ___, 142 S.Ct. at 2131, 213 L.Ed.2d at 411.

For example, it was a crime under the common law to "go[] armed to terrify the King's subjects." *Bruen*, ___ U.S. at ___, 142 S.Ct. at 2141, 213 L.Ed.2d at 422 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)). But this offense required possession of firearms and a malicious intent.

Second, when England tried to minimize *prospective* use of firearms by those considered dangerous, it was through sureties, not mass disarmament. *Marshall*, *supra*, at 717. But unlike §922(g)(1), these surety laws still presumed that a person could have arms. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 716–23; *Greenlee*, *supra*, at 260.

Third, to the extent that England tried to disarm whole classes of subjects, it did so on noxious grounds—and still permitted those targeted to keep arms for self-defense. Even when England assumed that Catholics were engaged in mass treason, they still had "a right to own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994).

In short, the English never tried to disarm all felons and had no historical regulation distinctly similar to §922(g)(1). Rather, they tried to limit the use of firearms by individuals found to be violent and rebellious. And even those individuals could keep arms for self-defense.

> ## 2. Forever depriving all people convicted of a felony of their right to bear arms does not comport with colonial and Founding-era history

"[T]here is little evidence of an early American practice of," *Bruen*, ___ U.S. at ___, 142 S.Ct. at 2142, 213 L.Ed.2d at 423, forever barring all people convicted of a felony from ever again possessing a firearm. The early United States accepted that those who committed crimes—even serious ones—retained a right to defend themselves. That can be seen in the colonies' and states' statutes, and early American practice.

First, no Founding-era statutes or interpretations of the common law barred all felons from possessing firearms. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010); *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring).

To the extent that the new Nation sought to disarm classes of people, the regulatory approach was a far cry from §922(g)(1). For example, the Virginia colony, like England, disarmed Catholics, still viewed as traitors to the crown. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted). But there was an exception for weapons allowed by a justice of the peace "for the defense of his house and person." *Id.*

Colonial and Founding-era practice also suggests that committing a serious crime did not result in a permanent disarmament. In 1787, after the participants in Shay's Rebellion attacked courthouses, a federal arsenal, and the Massachusetts militia, they were barred from bearing arms, *for three years*. *Id.* at 268–67. In fact, Massachusetts law required the Commonwealth to hold *and then return* the rebels' arms after that period. Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893). In other words, one of the first states punished people involved in one of the most serious violent crimes—armed rebellion—with merely a three-year firearm ban and promise to return the weapons used to attack the new government. In short, the American

colonies never tried to permanently disarm all felons and had no historical regulation distinctly similar to §922(g)(1).

> ### 3. Forever depriving all felons of their right to bear arms does not comport with 19th-century history

American practice and laws during the Nineteenth Century—before and after the Civil War—also confirms that §922(g)(1) does not comport with the "Nation's historical tradition of firearm regulation." *Bruen*, ___ U.S. at ___, 142 S.Ct. at 2135, 213 L.Ed.2d at 416. The United States continued to regulate—but not ban—firearm possession by those feared to be violent. *See Bruen*, ___ U.S. at ___, 142 U.S. at 2148, 213 L.Ed.2d at 430 (holding that 19th century surety laws allowed people likely to breach the peace to still keep guns for self-defense or if they posted a bond). But, as discussed above, that is not distinctly similar to §922(g)(1). There is no precursor to §922(g)(1)'s broad, class-based ban. The 19th century history provides clear evidence that mass disarmament for people convicted of an offense is unconstitutional. There was a consistent practice of allowing people who broke the law to keep weapons for self-defense.

4. **Although 20th-century history is irrelevant to the Second Amendment's scope, it confirms that §922(g)(1) is incompatible with the Nation's history and tradition of firearm regulation**

Because laws disarming anyone convicted of a felony did not appear until well into the twentieth century, they cannot shed light on this Nation's history and tradition of firearm regulation. The Court spoke without qualification: "20th-century evidence… does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, ___ U.S. at ___ n.28, 142 S.Ct. at 2154, 213 L.Ed.2d at 436. Congress did not pass §922(g)'s precursor until 1938 and it only restricted certain felons guilty of enumerated offenses. Federal Firearms Act (FFA), ch. 850, §2(e), 52 Stat. 1250, 1251. Congress did not extend its proscription to all felons and *possession* of any firearm that had *ever* traveled in interstate commerce until 1968. Marshall, *supra*, at 698–99.

The Second Amendment requires more. In *Bruen*, the Court declined to even consider 20th-century evidence because it was so out of step with historical practice. ___ U.S. at ___ n.28, 142 S.Ct. at 2154, 213 L.Ed.2d at 436. This Court should do the same. Without evidence of historical regulation of the possession of firearms by felons, an analysis

of 18 U.S.C. §922(g)(1) demonstrates its unconstitutionality. Mr. Shade's conviction should be vacated and his indictment dismissed.

### III. The Defendant had a right to present confidential mental health information used in mitigation of his sentence under seal

The issue of sealing documents represents a balancing between the right of the public to inspect judicial records and the competing interests of parties in protecting certain information from public disclosure.

This case involves potentially sensitive information about the Defendant contained in a sentencing memorandum. Under 18 U.S.C. §3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the Defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Certain information provided by a defendant for the purpose of assisting the court to impose an appropriate sentence is sensitive, confidential, or other otherwise legally protected.

Rule 49.1(d) of the Federal Rules of Criminal Procedure allows "The court may order that a filing be made under seal without redaction." However, the Local Rules adopted by the Western District are more narrow than the Federal Rules, carrying the presumption that all criminal pleadings will be open. *See* LCrR 49.1.1(a). Under the Local

Rules, "decisions as to whether to seal a particular pleading or any portion thereof will be made on a case-by-case basis by the Court upon the filing of a motion, with findings specific enough that a reviewing court can determine whether the sealing is consistent with the First Amendment or the common law right to public access." *Id.*

As this Court has explained, the public's right to access judicial documents stems from both the common law and from the First Amendment. Both the public and the press enjoy a "qualified right of access" to judicial documents filed in criminal proceedings. *Doe v. Public Citizen*, 749 F.3d 246, 265 (4th Cir. 2014). The purpose of this right is to serve the public's interest in monitoring court functions and promotes public trust in the judiciary. *Id.*, at 266. The right to access "derives from two independent sources: the common law and the First Amendment." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004). *United States v. Doe*, 962 F.3d 139, 145 (4th Cir. 2020). This right to access is presumptive, but not absolute and is subject to qualification. As this Court explains, "Criminal proceedings and related documents are thus presumptively open to the public. But because a presumption may be overcome, the public's right of access is qualified,

not absolute."*Doe*, 962 F.3d at 145 (citations omitted). "Moreover, the strength of the right of access varies depending on whether the public's right of access to the document or proceeding derives from the common law or the First Amendment." *Id.* The public's right to access documents under the First Amendment is narrower in scope but stronger in force, applying "only to particular judicial records and documents." *Doe*, 749 F.3d at 266. On the other hand, "The common law does not afford as much substantive protection to the interests of the press and public as the First Amendment does." *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986).

The Fourth Circuit has held that the common law right of access applies to sentencing memoranda. *United States v. Harris*, 890 F.3d 480, 491-92 (4th Cir. 2018).[8] However, the trial court "may, in its discretion,

---

[8] *But see In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) ("the First Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves."). Even if the First Amendment right of access applies, the existence of such a right "does not entitle the press and public to access in every case." *Doe*, 962 F.3d at 146 quoting *In re Wash. Post*, 807 F.2d at 390. A document protected by the First Amendment can be sealed "only if (1) closure serves a compelling interest; (2) there is a 'substantial probability' that, in the absence of closure, that compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect that compelling interest." *Id.*

seal documents if the public's right of access is outweighed by competing interests." *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir 1984).

Before a District Court may seal any document, there are three steps it must follow. First, it must provide public notice of the request to seal and allow interested parties the opportunity to object. Second, it must consider less drastic alternatives to sealing the documents. Finally, it must provide specific reasons and factual findings supporting its decision to seal the documents and rejecting the alternatives. *Ashcroft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000); *Knight*, 743 F.2d at 235-236.

Since the Defendant's original redacted sentencing memorandum was filed with the District Court on June 17, 2022, no one has come forward to object to the Defendant's efforts to protect his sensitive information from public disclosure. Where there is little public interest in disclosure and significant competing interest of the Defendant in confidentiality, the Court should consider sealing the sensitive information away from public disclosure.

With the exception of references to the defendant's cooperation with authorities, which should always be sealed, "the Court should consider

the privacy interests of individuals related to a criminal case without undermining the public interest in access to the judicial process, particularly including information material to understanding the case." *Harris*, 890 F.3d at 492.

As a preliminary matter before applying the balancing test, the Western District of North Carolina has in its rules severely disfavored sealing sentencing documents. In the district's first case applying the *Harris* balancing test, the district court held information central to Defendant's argument for a reduced sentence should be accessible to the public, explaining "As for other information a defendant seeks to seal, the Court should consider the materiality of the information to an understanding of the Defendant's case. The more significant the information to any relief the Defendant seeks, the less likely it should be placed in the record under seal." *United States v. Hutchins*, No. 1:18-cr-00022, 2018 U.S. Dist. LEXIS 146779, at *2 (W.D.N.C. Aug. 29, 2018). Ultimately, the Court determined "the public's right to know the bases for the actions of this Court outweigh any privacy interest of the Defendant and the other involved persons." *Id*, at *2.

The information which the Defendant sought to seal includes: (1) Confidential Psychological Evaluation of the Defendant (JA406-418); (2) The Treatment Recommendations of Confidential Psychological Evaluation (JA419); (3) Current mental health diagnosis of the Defendant (JA371-372, JA384); (4) Clinical observations of Dr. Durr during the evaluation (JA370, JA381); (5) Intelligence Tests of the Defendant conducted by Dr. Durr (JA371-372, JA383, JA384); and (6) Statements made by the Defendant to Dr. Durr for the purposes of diagnosis (JA370). Considering these matters, the Defendant believes that "the public's right of access to such information is substantially outweighed by the Defendant's competing interest in protecting the details of such information" under *Harris*, 890 F.3d at 492.

The redactions in the Sentencing Memorandum are narrowly employed to reach current mental health diagnosis, intelligence tests of the Defendant, clinical observations of Dr. Durr during the evaluation, and statements made by the Defendant to Dr. Durr for the purposes of diagnosis. Even though this ordinarily confidential information was presented to the Court in support of the Defendant's argument for a reduced sentence. it falls into a previously established form of protected

information which has been sealed in previous cases and which is protected by statute. The information which the Defendant seeks to shelter is protected health information, ordinarily protected from disclosure. *See* 45 C.F.R. §160.103. 42 U.S.C. §1320d.

Mental health evaluations, treatment recommendations, and clinical observations are sensitive medical information of the nature that is ordinarily sealed. These exhibits contain detailed personal information inclusive of information that is not relevant to the Defendant's arguments. The Defendant's competing interest in protecting the details of such information outweighs the public's right of access to such ordinarily confidential information.

The statements made by the Defendant to Dr. Durr as a psychologist are ordinarily confidential and protected from disclosure by the law. Specifically, "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure…." *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 1931, 135 L.Ed.2d 337 (1996). The Supreme Court based its finding of psychological privilege on a combination of the significant private interest in effective psychotherapy, the significant

public interest in the "mental health of our citizenry," and the modest evidentiary benefit of denying a psychotherapist-patient privilege. *See id.*, 518 U.S. at 10-11, 116 S.Ct. at 1928-29, 135 L.Ed.2d at 345. Despite the Defendant's voluntary disclosure, the Court should recognize the competing interest in protecting the confidentiality of this information survives where there is no other way for the Defendant to convey this sensitive and confidential information to the Court that is relevant to the determination of his sentence under 18 U.S.C. §3553(a).

Relying on *Harris*, the District Court denied the Defendant's request to seal the psychological evaluation.[9] Under the district court's current interpretation of this Circuit's opinions, there is no way for the Defendant to convey sensitive and confidential information that is relevant to the determination of his sentence under 18 U.S.C. §3553(a) without its public disclosure. The Defendant appeals that decision and requests that the Fourth Circuit recognize that certain information, such

---

[9] On one prior occasion, the Western District did allow a psychological evaluation to be filed under seal. In *United States v. Moore-Powell*, No. 1:18-cr-00139, 2019 U.S. Dist. LEXIS 144868, at *3 (W.D.N.C. Aug. 26, 2019), the Court allowed the Defendant to seal an exhibit to the Sentencing Memorandum containing the Defendant's psychological evaluation.

as a psychological evaluation, that is so confidential, sensitive, or private that it should still be protected from disclosure. We ask for a recognition that the Defendant's privacy interest in a psychological evaluation substantially outweighs common law and First Amendment arguments for access.

## CONCLUSION

The Defendant's sentence was tainted by significant procedural and legal errors. The errors occurred in the guidelines determination, the evaluation of the Defendant's requested departure, and in the application of the 18 U.S.C. §3553 factors. The Defendant should be sent back to District Court for resentencing.

First, the recent landmark Supreme Court decision in *United States v Bruen* laid out a new framework to test any restrictions on one's right to bear arms. That framework abrogates the Fourth Circuit's means-end test for firearm regulations, and assumptions that certain types of regulations are constitutional. A thorough analysis of the historical record shows that the government cannot meet its burden to show that §922(g)(1) complies with the Nation's tradition of firearm

regulation. Thus, the Defendant's conviction should be vacated, and the indictment should be dismissed.

In evaluating the balance between the right of the public to inspect and copy judicial records and the competing interests of parties to the judicial process in protecting certain information from public disclosure, Mr. Shade's Motion to Seal is narrowly drawn to defend his compelling interest in protecting confidential and sensitive mental health information. The redacted sentencing memo sufficiently protects the public's interest in disclosure of judicial records. The Court's denial of the Defendant's Motion to Seal should be reversed.

## REQUEST FOR ORAL ARGUMENT

Because of the unique issues raised in this case, the Appellant contends that oral argument is necessary in this case and would greatly benefit the court in reaching a proper determination.

RESPECTFULLY SUBMITTED THIS the 24th day of October, 2022.

/s/ James W. Kilbourne, Jr.
JAMES W. KILBOURNE, JR.
State Bar No. 24354

ALLEN STAHL & KILBOURNE, PLLC
Attorney for Defendant
20 Town Mountain Road
Asheville, NC 28801
(828) 254-4778
jamesk@asklawnc.com

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [12,782] words.

    [ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.  This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Century*]; *or*

    [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  October 24, 2022          /s/ James W. Kilbourne, Jr.
                                  *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 24th day of October, 2022, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Amy E. Ray
OFFICE OF THE U.S. ATTORNEY
100 Otis Street, Room 233
Asheville, North Carolina 28801
(828) 271-4661

*Counsel for Appellee*

I further certify that on this 24th day of October, 2022, I caused a copy of the Sealed Volume of the Joint Appendix to be served, on CD, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ James W. Kilbourne, Jr.
*Counsel for Appellant*