No. 22-4384

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

KEWAN MARQUIS SHADE,
Defendant–Appellant.

———————————

On Appeal from the United States District Court for the
Western District of North Carolina, No. 1:20-CR-103
(Hon. Martin K. Reidinger)

———————————

**ANSWERING BRIEF FOR THE UNITED STATES**

———————————

DENA J. KING
United States Attorney

AMY E. RAY
Assistant United States Attorney
Western District of North Carolina

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave. NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................... i

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF JURISDICTION ........................................... 1

ISSUES PRESENTED ...................................................................... 1

STATEMENT OF THE CASE .......................................................... 2

    A.    Procedural History ................................................................ 2

    B.    Relevant Facts ....................................................................... 2

        1.    Shade, a felon with a violent history, possessed multiple firearms. ................................................... 2

        2.    Shade pleaded guilty to possession of a firearm by a felon, and the district court sentenced him to 60 months of imprisonment. ............................................ 4

SUMMARY OF ARGUMENT ........................................................ 6

ARGUMENT ...................................................................................... 8

I.    Shade Cannot Show on Plain-Error Review That § 922(g)(1) Violates the Second Amendment. ............................................. 8

    A.    Standard of review ............................................................... 9

    B.    *Bruen* did not undermine this Court's decisions upholding felon-dispossession statutes ............................................. 9

        1.    Following *Heller*, this Court repeatedly upheld felon-dispossession statutes. ..................................... 10

        2.    *Bruen* does not call this Court's prior decisions into question. ........................................................... 12

    C.    Even if *Bruen* abrogated this Court's felon-dispossession precedents, Shade could not show plain error under *Bruen*. ........ 17

i

1.    The Second Amendment's text and historical context indicate that felons can be constitutionally disarmed. ....... 17

2.    The Nation's historical tradition confirms that felons can be dispossessed of firearms. ........................................ 23

    a.    Laws authorizing capital punishment and estate forfeiture ............................................................... 23

    b.    Laws disarming untrustworthy individuals and those outside the political community..................... 28

    c.    Comparison to § 922(g)(1)...................................... 31

D.    At the very least, § 922(g)(1) is constitutional as applied to Shade based on his prior convictions for violent felonies............ 34

II.    The District Court's 60-Month Sentence Was Procedurally Reasonable. ........................................................................ 35

A.    Standard of review .................................................................. 36

B.    North Carolina assault with a deadly weapon with intent to kill is a crime of violence under the Guidelines......................... 36

1.    The offense involves purposeful or knowing conduct........ 37

2.    The offense requires a communicated threat. ................... 40

C.    The district court did not clearly err in finding that Shade recklessly endangered others during flight from police. ............. 42

D.    The district court did not abuse its discretion when explaining its reasons for rejecting Shade's request for a downward departure or variance. ............................................. 45

E.    The district court properly considered the § 3553(a) factors. ....... 48

F.    Any possible error in calculating the Guidelines range or explaining the reasons for the sentence was harmless................. 51

III.    This Court Should Not Review Shade's Claim That Parts of His Sentencing Memorandum Should Remain Under Seal. ...................... 53

ii

A.  Standard of review ...................................................... 53

B.  Background ............................................................. 53

C.  Shade's notice of appeal did not designate the order he now
    seeks to challenge...................................................... 55

D.  The order Shade seeks to challenge is not an appealable final
    order. ................................................................. 56

CONCLUSION............................................................... 59

CERTIFICATE OF COMPLIANCE ........................................ 60

CERTIFICATE OF SERVICE ............................................... 61

# TABLE OF AUTHORITIES

## Cases

*Baze v. Rees*,
  553 U.S. 35 (2008) ................................................................ 24

*Borden v. United States*,
  141 S. Ct. 1817 (2021) ......................................................... 37

*Carlton v. Hollingsworth*,
  247 Fed. App'x 456 (4th Cir. 2007) ...................................... 57

*Catlin v. United States,*
  324 U.S. 229 (1945) .............................................................. 56

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ......................................................*passim*

*Dorsey v. Kiser*,
  697 Fed. App'x 783 (4th Cir. 2017) ...................................... 56

*Folajtar v. Attorney General of the U.S.*,
  980 F.3d 897 (3d Cir. 2020)............................................24, 34

*Gall v. United States*,
  552 U.S. 38 (2007)..........................................................36, 48

*Goode v. Central Va. Legal Aid Soc'y, Inc.*,
  807 F.3d 619 (4th Cir. 2015), *abrogated on other grounds by*
  *Bing v. Brivo Sys., LLC*, 959 F.3d 605 (4th Cir. 2020) ................ 57

*Green v. Bd. of Elections of City of N.Y.*,
  380 F.2d 445 (2d Cir. 1967)................................................... 31

*Hamilton v. Pallozzi*,
  848 F.3d 614 (4th Cir. 2017) ...........................................*passim*

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ................................................. 34

*Medina v. Whitaker*,
　913 F.3d 152 (D.C. Cir. 2019) ........................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
　142 S. Ct. 2111 (2022) ....................................................................*passim*

*Range v. Attorney General*,
　53 F.4th 262 (3d Cir. 2022), *vacated upon granting of rehearing en banc*,
　2023 WL 118469 (Jan. 6, 2023) ....................................................*passim*

*Rita v. United States*,
　551 U.S. 338 (2007) ................................................................................ 47

*Robertson v. Baldwin*,
　165 U.S. 275 (1897) ............................................................................... 19

*Smith v. Barry*,
　502 U.S. 244 (1992) ............................................................................... 56

*State v. Coble*,
　527 S.E.2d 45 (N.C. 2000) ...............................................................38, 39

*State v. Cogdell*,
　599 S.E.2d 570 (N.C. Ct. App. 2004) .................................................... 41

*State v. Ferguson*,
　135 S.E.2d 626 (N.C. 1964) ................................................................... 39

*State v. Jones*,
　538 S.E.2d 917 (N.C. 2000) ................................................................... 38

*State v. Musselwhite*,
　297 S.E.2d 181 (N.C. Ct. App. 1982) .................................................... 41

*State v. Roberts*,
　155 S.E.2d 303 (N.C. 1967) ................................................................... 41

*State v. Starr*,
　703 S.E.2d 876 (N.C. Ct. App. 2011) .................................................... 41

v

*Texas v. United States*,
  523 U.S. 296 (1998) ............................................................... 58

*Tyler v. Hillsdale County Sheriff's Dep't*,
  837 F.3d 678 (6th Cir. 2016) (en banc) .................................. 31

*Under Seal v. Under Seal*,
  326 F.3d 479 (4th Cir. 2003) ................................................. 53

*United States v. Avila*,
  No. 22-50088, 2022 WL 17832287 (5th Cir. Dec. 21, 2022) .................... 16

*United States v. Bah*,
  694 Fed. App'x 122 (4th Cir. 2017) ....................................... 47

*United States v. Blue*,
  877 F.3d 513 (4th Cir. 2017) ................................................. 45

*United States v. Boulware*,
  604 F.3d 832 (4th Cir. 2010) .............................................51, 52

*United States v. Brewer*,
  520 F.3d 367 (4th Cir. 2008) ................................................. 48

*United States v. Buie*,
  441 Fed. App'x 173 (4th Cir. 2011) ....................................... 44

*United States v. Burnley*,
  988 F.3d 184 (4th Cir. 2021) .............................................36, 43

*United States v. Carter*,
  474 Fed. App'x 331 (4th Cir. 2012) ....................................... 43

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ................................................. 10

*United States v. Cisson*,
  33 F.4th 185 (4th Cir. 2022) ................................................. 51

*United States v. Coleman*,
  No. 3:22-CR-8, 2023 WL 122401 (N.D.W.V. Jan. 6, 2023) .................... 16

*United States v. Covington*,
880 F.3d 129 (4th Cir. 2018) .................................................. 36

*United States v. Davis*,
855 F.3d 587 (4th Cir. 2017) ................................................. 15

*United States v. Dennings*,
922 F.3d 232 (4th Cir. 2019) .................................................. 36

*United States v. Doe*,
962 F.3d 139 (4th Cir. 2020) ..................................... 53, 56, 58

*United States v. Evans*,
403 Fed. App'x 818 (4th Cir. 2010) ....................................... 44

*United States v. Gonzalez*,
No. 22-1242, 2022 WL 4376074 (7th Cir. Sept. 22, 2022) ........................ 35

*United States v. Gutierrez*,
963 F.3d 320 (4th Cir. 2020) .................................................. 49

*United States v. Hale*,
834 Fed. App'x 789 (4th Cir. 2020) ....................................... 36

*United States v. Harper*,
466 F.3d 634 (8th Cir. 2006) ................................................. 43

*United States v. Harris*,
890 F.3d 480 (4th Cir. 2018) ...........................................45, 54

*United States v. Hawes*,
309 Fed. App'x 726 (4th Cir. 2009) ....................................... 50

*United States v. Hawley*,
919 F.3d 252 (4th Cir. 2019) .................................................. 36

*United States v. Hill*,
776 F.3d 243 (4th Cir. 2015) ................................................. 15

*United States v. Holland*,
749 Fed. App'x 162 (4th Cir. 2018) ....................................... 39

vii

*United States v. Jackson,*
  738 Fed. App'x 152 (4th Cir. 2018) ........................................................ 39

*United States v. Jimenez-Shilon,*
  34 F.4th 1042 (11th Cir. 2022) ............................................................... 29

*United States v. Johnson,*
  600 Fed. App'x 140 (4th Cir. 2015) ....................................................... 57

*United States v. Jones,*
  174 Fed. App'x 791 (4th Cir. 2006) ....................................................... 44

*United States v. Kelly,*
  No. 3:22-CR-37, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) .......... 33

*United States v. Kline,*
  494 Fed. App'x 323 (4th Cir. 2012) ....................................................... 11

*United States v. Lunsford,*
  470 Fed. App'x 184 (4th Cir. 2012) ....................................................... 11

*United States v. Marcus,*
  560 U.S. 258 (2010) ........................................................................ 9, 15

*United States v. McCain,*
  974 F.3d 506 (4th Cir. 2020) ................................................................. 36

*United States v. Middleton,*
  883 F.3d 485 (4th Cir. 2018) ................................................................. 15

*United States v. Moore,*
  666 F.3d 313 (4th Cir. 2012) ...........................................................11, 13

*United States v. Morrison,*
  504 Fed. App'x 247 (4th Cir. 2013) ....................................................... 11

*United States v. Olano,*
  507 U.S. 725 (1993) ................................................................................ 9

*United States v. Pruess,*
  703 F.3d 242 (4th Cir. 2012) ...................................................... 6, 9, 11, 30

*United States v. Rice,*
    36 F.4th 578 (4th Cir. 2022) ..................................................... 37

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) (en banc)................................... 20

*United States v. Smoot,*
    690 F.3d 215 (4th Cir. 2012) ..................................................... 11

*United States v. Taylor,*
    142 S. Ct. 2015 (2022)................................................. 39, 40, 41

*United States v. Taylor,*
    594 Fed. App'x 784 (4th Cir. 2014) ..................................... 9, 11

*United States v. Thorpe,*
    680 Fed. App'x 209 (4th Cir. 2017) ........................................ 11

*United States v. Townsend,*
    886 F.3d 441 (4th Cir. 2018) ..............................................38, 39

*United States v. Vereen,*
    703 Fed. App'x 171 (4th Cir. 2017) ........................................ 38

*United States v. Weaver,*
    425 Fed. App'x 267 (4th Cir. 2011) ........................................ 44

*United States v. Williams,*
    665 Fed. App'x 290 (4th Cir. 2016) ........................................ 44

*Williams v. Clarke,*
    829 Fed. App'x 655 (4th Cir. 2020) ........................................ 56

**Statutes**

18 U.S.C. § 922..................................................................1, 2, 4, 6

18 U.S.C. § 924..................................................................38, 40

18 U.S.C. § 3231 ...................................................................... 1

18 U.S.C. § 3553 ................................................................48, 50

18 U.S.C. § 3742 .......................................................................... 1

28 U.S.C. § 1291 .................................................................... 1, 56

18 Pa. Cons. Stat. § 6109 .......................................................... 22

Ga. Code Ann. § 16-11-129 ...................................................... 22

La. Stat. Ann. § 40:1379.3 ........................................................ 22

N.C. Stat. Ann. § 14-32 .................................................. 2, 37, 38

N.C. Stat. Ann. § 14-34.5 ............................................................ 2

Tex. Gov't Code Ann. § 411.172 ............................................... 22

W. Va. Code Ann. § 61-7-4.......................................................... 22

**Historical Statutes**

1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments (1811) ........................................................... 27

1 The Public Acts of the General Assembly of North Carolina (1804)........... 30

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ...................... 19

1 W. & M., Sess. 1, ch. 15, 6 Statutes of the Realm 71 ................. 28

14 Journal of the House of Lords (1685-1691) ............................ 28

2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) (1886) ................................................. 25

2 Statutes at Large of Pennsylvania from 1682 to 1801 (1896) ...................... 26

3 Acts and Resolves, Public and Private, of the Province of the
Massachusetts Bay (1878) ....................................................... 27

4 Journals of the Continental Congress (1906) ............................. 30

5 The Acts and Resolves, Public and Private, of the Province of the
Massachusetts Bay (1886) ....................................................... 30

7 Records of the Colony of Rhode Island and Providence Plantations, in
New England ....................................................................... 30

7 Statutes at Large; Being A Collection of All the Laws of Virginia 35-36
(1820) ................................................................................ 29

9 Statutes at Large of Pennsylvania ........................................... 30

9 Statutes at Large; Being A Collection of All the Laws of Virginia
(1821) ................................................................................ 30

9 William Waller Hening, Statutes at Large; Being a Collection of All
the Laws of Virginia, from the First Session of the Legislature (1821) ...... 26

Acts and Laws of The English Colony of Rhode Island and Providence-
Plantations in New-England in America (1767) ....................... 27

Acts and Resolves of Massachusetts 1786-87 (1893)..................... 34

An Act for the Punishment of Certain Crimes Against the United States,
1 Stat. 112-15 (1790).............................................................. 24

Public Records of the Colony of Connecticut (1890)..................... 29

Rutgers, New Jersey Session Laws Online, Acts of the General
Assembly of the State of New-Jersey ...................................... 30

## Other Authorities

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) ............. 20

4 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1769) ...... 23

Akhil Reed Amar, *The Bill of Rights* (1998)....................................................... 18

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ................................................................................................................. 24

Brian C. Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. Univ. L. Rev. 65 (2003) ................................................................................................... 31

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ....................... 34

Stuart Banner, *The Death Penalty: An American History* (2002)...................... 24

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1st ed. 1868) ................................................................................................................ 18

United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2020, Western District of North Carolina ............................. 49

## Rules and Sentencing Guidelines

Fed. R. App. P. 3 ................................................................................................ 55

Fed. R. App. P. 4 .................................................................................................. 1

Fed. R. Crim. P. 52 .............................................................................................. 9

USSG § 2A1.4 ................................................................................................... 42

USSG § 2K2.1 .............................................................................................. 5, 36

USSG § 3C1.2 ................................................................................... 5, 42, 43, 44

USSG § 3E1.1 ..................................................................................................... 5

USSG § 4B1.2 ............................................................................................*passim*

USSG § 5H1.3 ................................................................................................... 45

USSG § 5K2.11 ........................................................................ 45

USSG § 5K2.12 ................................................................... 45, 47

USSG § 5K2.13 ........................................................................ 46

## STATEMENT OF JURISDICTION

Defendant–Appellant Kewan Marquis Shade appeals from a judgment of conviction in a criminal case. The district court (Reidinger, J.) had jurisdiction under 18 U.S.C. § 3231 and entered judgment on June 27, 2022. J.A.273. Shade filed a timely notice of appeal on July 7, 2022. J.A.306; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction to review the judgment of conviction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

The district court entered an order denying a motion for leave to file under seal on June 27, 2022. J.A.280-282. Shade's notice of appeal did not reference that order. J.A.306. And, for reasons set forth in Part III of the brief, this Court lacks jurisdiction to review that non-final order.

## ISSUES PRESENTED

1. Whether, on plain-error review, 18 U.S.C. § 922(g)(1)'s prohibition on possession of a firearm by a felon violates the Second Amendment.

2. Whether the district court erred at sentencing in (a) concluding that North Carolina assault with a deadly weapon with intent to kill is a "crime of violence" under USSG § 4B1.2, (b) finding that Shade recklessly endangered others during flight from police, (c) addressing Shade's request for a downward departure, or (d) applying the statutory sentencing factors.

1

3.    Whether this Court has jurisdiction to review Shade's claim relating to the sealing of his sentencing memorandum.

## STATEMENT OF THE CASE

### A.    Procedural History

A grand jury in the Western District of North Carolina charged Shade with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). J.A.12-13.  Shade pleaded guilty to that offense without a plea agreement. J.A.107-132 (plea transcript).  The district court sentenced Shade to 60 months of imprisonment, to be followed by three years of supervised release.  J.A.274-275.

### B.    Relevant Facts

#### 1.    Shade, a felon with a violent history, possessed multiple firearms.

In 2014, Shade was convicted in Buncombe County, North Carolina, on five counts of assault with a deadly weapon with intent to kill, in violation of N.C. Stat. Ann. § 14-32(c), and one count of assaulting a law enforcement officer with a firearm, in violation of N.C. Stat. Ann. § 14-34.5(a).  J.A.103, J.A.345-346.  Those convictions arose from an incident in which Shade fired a handgun at two police officers "with intent to kill" while the officers were trying to arrest another person on outstanding warrants.  J.A.345.  Shade received a sentence of 25 to 42 months of imprisonment.  J.A.345.

2

In May 2020, Detective Brad Beddow with the Asheville Police Department was monitoring Snapchat accounts and saw that Shade's account had posted a picture of a Taurus 9mm pistol with the number "300," which Beddow believed meant that "the gun was for sale for $300." J.A.104. Later that day, Shade posted asking if anyone had a "glock for sale." J.A.104. The next day, Shade again posted a picture of the Taurus, indicating that it was for sale for $300. J.A.104.

A week later, Detective Beddow posted a picture of three Glock pistols on his undercover Snapchat account. J.A.104. Shade responded to the post and gave his cell-phone number. J.A.104. After several calls over the course of the next week, Shade arranged to buy the pistols. J.A.104. Shade met undercover detectives and bought the three pistols, which officers had placed in a red and black North Face backpack. J.A.104. Although the agreed-upon price was $900 for all three pistols, Shade gave the detectives only $700. J.A.104.

Police officers tried to stop Shade immediately after the transaction, but he fled in his SUV. J.A.104. During the chase, Shade ran two red lights and drove on the wrong side of the road. J.A.343. Officers located Shade's vehicle in front of his apartment building and found him on the back balcony. J.A.104. After arresting Shade, officers found the backpack with the guns (one

3

of which had fallen out) in the brush below the apartment building.  J.A.104.

An apartment-complex employee told officers that he had seen Shade drive up

and run into his apartment before running back out and grabbing a red and

black bag from the SUV.  J.A.104.

After receiving *Miranda* warnings, Shade initially gave a false story about

how he obtained the guns.  J.A.105.  But he admitted to purchasing them after

officers told him the seller had been an undercover detective.  J.A.105.  He also

admitted to having another gun, a Taurus 9mm, in the center console of his

SUV.  J.A.105.  Shade and his girlfriend consented to a search of the SUV,

where officers found the pistol, which had been reported as stolen.  J.A.105.

Shade admitted that he had previously "done 3 years for seven felonies."

J.A.105.

> **2.    Shade pleaded guilty to possession of a firearm by a felon, and the district court sentenced him to 60 months of imprisonment.**

A grand jury charged Shade with one count of possession of a firearm by

a felon, in violation of 18 U.S.C. § 922(g)(1), alleging that Shade possessed

four firearms and 12 rounds of 9mm ammunition.  J.A.12-13.  Shade did not

challenge the charge under the Second Amendment, and he pleaded guilty

without a plea agreement, J.A.124-125, J.A.215-217, stipulating that he "knew

at the time of the offense he was not supposed to possess firearms because he

4

had been convicted of crimes where he faced more than one year in prison," J.A.105.

In preparation for sentencing, the Probation Office prepared a presentence report that calculated Shade's total offense level as 23 based on the following: a base offense level of 20 because Shade committed the offense subsequent to sustaining a felony conviction for a crime of violence, USSG § 2K2.1(a)(4)(A); a two-level enhancement for possessing four or more firearms, § 2K2.1(b)(1)(A); a two-level enhancement for possessing a stolen firearm, § 2K2.1(b)(4)(A); a two-level enhancement for reckless endangerment during flight, § 3C1.2; and a three-level reduction for acceptance of responsibility, § 3E1.1. J.A.343-344. Combined with Shade's criminal history category of III, his offense level of 23 yielded a Guidelines range of 57 to 71 months. J.A.350.

Shade objected to the presentence report, arguing (among other things) that his prior convictions were not "crimes of violence" and that he did not qualify for the reckless-endangerment or stolen-firearm enhancements. J.A.353-356. He argued that he qualified for a downward departure or variance based on mental or emotional conditions, lesser harms, coercion or duress, and diminished capacity. J.A.356, 381-384. And he asked the court to vary downward to between 24 and 36 months of imprisonment. J.A.388.

5

At the sentencing hearing, the district court overruled Shade's objections and concluded that Shade's Guidelines range was 57 to 71 months. J.A.247-248. The district court sentenced Shade to 60 months of imprisonment, to be followed by three years of supervised release. J.A.261-262. The district court explained that it was imposing a sentence "pretty close to the low end of the guideline range" based on Shade's "mental and emotional condition" and his "diminished capacity." J.A.268; *see* J.A.269.

## SUMMARY OF ARGUMENT

1. Shade cannot show on plain-error review that the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), is unconstitutional. This Court has upheld that provision multiple times, relying on the Supreme Court's statement that such provisions are presumptively lawful. *See United States v. Pruess*, 703 F.3d 242, 245-47 (4th Cir. 2012). And the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), does not call into question this Court's prior decisions upholding § 922(g)(1). In fact, the concurring justices in *Bruen* reiterated the lawfulness of felon-dispossession statutes. Because *Bruen* does not overrule this Court's precedents, they are binding and require affirmance.

Even if the Court were to consider the issue afresh, § 922(g)(1) is constitutional after *Bruen*. The Second Amendment's text does not prevent

6

disarming felons, both because felons can be excluded from the political community and because the Amendment codified a pre-existing right that excluded felons. Moreover, *Heller* and *Bruen* interpreted the Amendment's text as protecting the rights of "law-abiding citizens," which necessarily excludes felons. And *Bruen* endorsed the "shall-issue" firearm-carry licensing schemes of states that specifically deny licenses to felons.

Section 922(g)(1) is also consistent with the historical tradition of firearm regulation. When the Second Amendment was adopted, persons convicted of felonies were regularly subject to severe penalties, including death and forfeiture of their entire estates. Additionally, colonial and state legislatures possessed the unquestioned power to disarm citizens seen as being untrustworthy or outside the political community, such as those who refused to take loyalty oaths. Although not identical to § 922(g)(1), these statutes are relevantly similar and demonstrate that § 922(g)(1) is constitutional. At the very least, as someone with multiple convictions for *violent* felonies, Shade cannot obtain relief from his § 922(g)(1) conviction on plain-error review.

2. Shade cannot prevail on his challenges to his 60-month sentence. The district court correctly concluded, consistent with this Court's precedent, that assault with a deadly weapon with intent to kill under North Carolina law is a "crime of violence" under the Sentencing Guidelines. The district court did

7

not clearly err in finding that Shade recklessly endangered others while fleeing

from law enforcement.  And the district court fully considered Shade's

arguments for a lower sentence and adequately explained its reasons for the

sentence imposed.

3. Finally, Shade's argument that his unredacted sentencing

memorandum should remain under seal is not properly before this Court.  The

district court's order denying Shade's initial motion to seal is not an appealable

final order because the court invited Shade to file a renewed motion, which

Shade did.  The district court has not yet acted on that motion.  And the

documents at issue remain under seal.  This Court should allow the district

court to consider the renewed motion to seal in the first instance and should

decline to issue an advisory opinion.

## ARGUMENT

## I.    Shade Cannot Show on Plain-Error Review That § 922(g)(1) Violates the Second Amendment.

Shade argues (Br. 32-56) that 18 U.S.C. § 922(g)(1) violates the Second

Amendment after *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.

2111 (2022).  This brief takes up that issue first, since (unlike his other claims)

it relates to the validity of Shade's conviction.  Shade failed to raise a Second

Amendment challenge in the district court, and he cannot demonstrate on

plain-error review that § 922(g)(1) is unconstitutional, particularly as applied to a violent felon like himself.

### A.     Standard of review

This Court ordinarily reviews Second Amendment challenges de novo. *United States v. Pruess*, 703 F.3d 242, 245 (4th Cir. 2012).  But where, as here, a defendant fails to preserve a Second Amendment claim below, this Court reviews only for plain error.  *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731 (1993); *United States v. Taylor*, 594 Fed. App'x 784, 790 (4th Cir. 2014) (per curiam) (unpublished).  To obtain relief under this standard, Shade must show "that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected [his] substantial rights . . . ; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quotations and brackets omitted).

### B.     *Bruen* did not undermine this Court's decisions upholding felon-dispossession statutes.

Shade cannot satisfy his burden of a showing a clear or obvious error because this Court has previously upheld felon-dispossession statutes, including 18 U.S.C. § 922(g)(1), and *Bruen* did not overrule those decisions or call them into question.

### 1. Following *Heller*, this Court repeatedly upheld felon-dispossession statutes.

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. And it said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626-27 & n.26.

After *Heller*, this Court adopted a "two-part approach to Second Amendment claims." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Under the first step, the Court undertook a "historical inquiry" that asked "whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Id.* "If the challenged regulation burden[ed] conduct that was within the scope of the Second Amendment as historically understood," the Court "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id.*

Relying on *Heller*'s statement that laws dispossessing felons are "presumptively lawful," this Court upheld § 922(g)(1) under a "more

10

streamlined" *Chester* analysis. *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012). *Moore* held that, whatever *Heller* meant by "presumptively lawful," *Heller*'s statement "negates a facial challenge to a felon in possession statute like § 922(g)(1)." *Id.* *Moore* also rejected the defendant's as-applied challenge because he was not "within the category of citizens" that *Heller* said possessed a right to bear arms: "'*law-abiding responsible* citizens.'" *Id.* at 319 (quoting *Heller*, 554 U.S. at 635, and adding emphasis). "Particularly in light of his extensive and violent criminal history," this Court concluded that the defendant's conduct was "plainly outside the scope of the Second Amendment."[1] *Id.* at 320.

More recently, this Court held that a Maryland felon-dispossession statute was constitutional under "step one of the *Chester* inquiry." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). The Court held that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Id.* "Where the

---

[1] Since *Moore*, this Court has rejected many more as-applied Second Amendment challenges to § 922(g)(1). *See United States v. Smoot*, 690 F.3d 215, 221-22 (4th Cir. 2012); *Pruess*, 703 F.3d at 245-47; *United States v. Lunsford*, 470 Fed. App'x 184, 185 (4th Cir. 2012) (per curiam) (unpublished); *United States v. Kline*, 494 Fed. App'x 323, 324-26 (4th Cir. 2012) (per curiam) (unpublished); *United States v. Morrison*, 504 Fed. App'x 247, 250 (4th Cir. 2013) (per curiam) (unpublished); *Taylor*, 594 Fed. App'x at 790; *United States v. Thorpe*, 680 Fed. App'x 209, 211 (4th Cir. 2017) (per curiam) (unpublished).

11

sovereign has labeled the crime a felony, it represents the sovereign's determination that the crime reflects grave misjudgment and maladjustment," and "[a] felon cannot be returned to the category of 'law-abiding, responsible citizens' . . . unless the felony conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful." *Id.* (quotations omitted).

> ### 2.    *Bruen* does not call this Court's prior decisions into question.

In *Bruen*, 142 S. Ct. at 2122, the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156.

*Bruen* rejected the "two-step" framework adopted by most courts of appeals (including this Court) after *Heller* that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125-26. *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. But the Court "decline[d] to adopt" the second step of that framework,

12

holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

*Bruen* "reiterate[d]" the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

This Court's decisions upholding § 922(g)(1) are consistent with the text-and-history analysis that *Bruen* requires. Those decisions did not rely on the kind of means-end scrutiny that *Bruen* rejected but instead relied on *Heller*'s statements that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful," 554 U.S. at 626-27 & n.26, and that the Second Amendment protects the rights of "law-abiding, responsible citizens," *id.* at 635. *See Hamilton*, 848 F.3d at 625-28; *Moore*, 666 F.3d at 318-20. *Bruen* does not call *Heller*'s statements into question. Justice Alito explained in concurrence that *Bruen* does not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito. J.,

13

concurring).  And Justice Kavanaugh (joined by the Chief Justice) emphasized that "the Second Amendment allows a 'variety' of gun regulations" and reiterated *Heller*'s statement about not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons."  *Id.* at 2162 (Kavanaugh, J., concurring) (quotations omitted).

Shade incorrectly claims that *Bruen* overrules this Court's "precedent holding that *Heller*'s list of 'presumptively lawful' firearms restrictions automatically controls absent a full historical analysis."  Br. 43.  He points out (Br. 45-46) that, despite *Heller*'s observation that most 19th-century courts upheld "prohibitions on carrying concealed weapons," 554 U.S. at 626, *Bruen* nevertheless conducted a full historical analysis when considering New York's license-to-carry scheme.  *See Bruen*, 142 S. Ct. at 2135-56.  Unlike the historical concealed-carry laws mentioned by *Heller*, however, the New York licensing scheme banned "public carry altogether."  *Id.* at 2146.  And, unlike laws dispossessing felons, the New York scheme burdened the firearm-carry rights of "ordinary, law-abiding, adult citizens."  *Id.* at 2134.  Thus, *Bruen*'s exhaustive historical analysis does not suggest that such an inquiry is necessary to uphold § 922(g)(1).

This Court's precedent "controls" unless "intervening case law from [this C]ourt sitting en banc or the Supreme Court has explicitly or implicitly

14

overruled it." *United States v. Hill*, 776 F.3d 243, 248 (4th Cir. 2015). And where a Supreme Court decision "abrogate[s] a portion" of this Court's prior precedent, other parts of the precedent remain "good law." *United States v. Middleton*, 883 F.3d 485, 491 (4th Cir. 2018). Here, *Bruen* abrogated the second step, means-end-scrutiny step of this Court's framework. But it did not call into question this Court's decisions holding that felon-dispossession laws are consistent with the Second Amendment under the first, non-abrogated step of this Court's pre-*Bruen* framework. Indeed, as just explained, three justices in the *Bruen* majority took pains to re-emphasize the parts of *Heller* on which this Court relied. Because this circuit precedent remains "good law," *Middleton*, 883 F.3d at 491, and squarely forecloses Shade's claim, he cannot show any error in his conviction under § 922(g)(1).

Even if Shade could show error, he could not show that it was "clear or obvious." *Marcus*, 560 U.S. at 262 (quotations omitted). "[A]n error is plain if (1) the explicit language of a statute or rule resolves the question or (2) at the time of appellate consideration, the settled law of the Supreme Court or this Court establishes that an error has occurred." *United States v. Davis*, 855 F.3d 587, 595-96 (4th Cir. 2017). Neither is true here. *Bruen* neither abrogates this Court's decisions upholding § 922(g)(1) nor calls that statute's constitutionality into question. *See United States v. Avila*, No. 22-50088, 2022 WL 17832287, at

15

*2 (5th Cir. Dec. 21, 2022) (per curiam) (unpublished) (rejecting a plain-error

challenge to 18 U.S.C. § 922(n) where there was "no binding precedent

holding § 922(n) unconstitutional," such that accepting the challenge would

require "extend[ing]" *Bruen* "to an entirely new context").

In fact, dozens of courts—including many district courts throughout this

Circuit—have upheld § 922(g)(1) as constitutional after *Bruen*. *See United States

v. Coleman*, No. 3:22-CR-8, 2023 WL 122401, at *3 (N.D.W.V. Jan. 6, 2023)

(citing district court cases within the Fourth Circuit). As a panel of the Third

Circuit persuasively explained, legislatures can, consistent with the Second

Amendment's text and history, prohibit firearm possession by "those who have

demonstrated disregard for the rule of law through the commission of felony."

*Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam), *vacated

upon granting of rehearing en banc*, 2023 WL 118469 (Jan. 6, 2023). Although

that panel decision has been vacated, its conclusion is consistent with the

longstanding consensus among the courts of appeals: "no circuit" has ever

"held [18 U.S.C. § 922(g)(1)] unconstitutional as applied" to an individual

convicted of an offense labeled a felony. *Medina v. Whitaker*, 913 F.3d 152,

155, 158 (D.C. Cir. 2019) (upholding § 922(g)(1) based on "tradition and

history").

**C.** **Even if *Bruen* abrogated this Court's felon-dispossession precedents, Shade could not show plain error under *Bruen*.**

Even if *Bruen* required this Court to consider § 922(g)(1)'s constitutionality afresh, Shade could not prevail—particularly on plain-error review. The Second Amendment's text does not prevent Congress from banning firearm possession by felons. And § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.

**1.** **The Second Amendment's text and historical context indicate that felons can be constitutionally disarmed.**

Under *Bruen*, when considering the constitutionality of a firearms regulation, courts look to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Two independent aspects of the Amendment's text demonstrate that it does not prevent legislatures from disarming felons. And *Heller* and *Bruen*'s authoritative interpretation of the text confirm that view.

First, felons do not fall within "the people" protected by the Second Amendment, a term that *Heller* said refers to "members of the political community." *Heller*, 554 U.S. at 580. Legislatures have historically had wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *id.* at 616, "the *people* in whom is vested the sovereignty of the

17

State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868).  Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998).  Indeed, today it remains the case that "[t]he commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160.

Contrary to Shade's contention (Br. 48), the term "people" need not bear precisely the same meaning in the Second Amendment that it does in the First and Fourth Amendments.  The latter provisions undisputedly protect even those who have been excluded from "the political community" because of felony convictions.  *Heller*, 554 U.S. at 580.  But *Heller* indicates that even those who are protected by other provisions of the Bill of Rights—including "felons

and the mentally ill," *id.* at 626—nevertheless can be disarmed consistent with the Second Amendment.

Second, regardless of whether felons fall within "the people," the "right . . . to keep and bear arms" has never been understood to prevent the disarming of felons. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The 1689 English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *id.* at 593, provided that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The wording of that provision indicates that "the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law-abiding to exercise the right to bear arms." *Range*, 53 F.4th at 275. Thus, when the "Second Amendment . . . codified [the] *pre-existing* right" to bear arms, *Heller*, 554 U.S. at 592, it codified a right that was "not unlimited," *id.* at 626, and was not understood to extend to lawbreakers.

The Constitution's ratification debates support this understanding of the Amendment's text. In what *Heller* called a "highly influential" proposal, 554

19

U.S. at 604, a group of Pennsylvania antifederalists advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)).  This "Second Amendment precursor[ ]," *Heller*, 554 U.S. at 604, indicates that the Amendment allowed the legislature to disarm those who had committed serious "crimes" such as felonies.  Thus, the Amendment's text, understood in its historical context, does not prevent Congress from disarming felons.

The Supreme Court's authoritative interpretation of the Second Amendment's text confirms this view.  *Heller* explained that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.  *Heller* indicated that "prohibitions on carrying concealed weapons" were lawful. *Id*. It said the Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627 (quotations omitted).  And the Court said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and

20

government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. Thus, in conducting its "textual analysis" of the Second Amendment, *id.* at 578, *Heller* saw no inconsistency between the Amendment's text and laws prohibiting "possession of firearms by felons," *id.* at 626.

Moreover, *Heller* defined the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635, a category which clearly excludes felons. *See Hamilton*, 848 F.3d at 626. *Bruen* echoed that definition, stating no fewer than fourteen times that the Second Amendment protects the rights of "law-abiding" citizens. *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. And six justices took pains to emphasize that *Bruen* did nothing to upset *Heller*'s and *McDonald*'s reassurances that certain firearms regulations, such as prohibitions on the possession of firearms by felons, are constitutional. *See id.* at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald . . . ,* about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "'longstanding prohibitions on the possession of firearms by felons'" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626, 636)); *id.* at 2189

21

(Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms).

Additionally, when "reiterat[ing]" the standard applicable to Second Amendment claims, *Bruen*, 142 S. Ct. at 2129, *Bruen* endorsed the constitutionality of "shall-issue" firearm-carry licensing regimes, many of which deny licenses to felons either directly or through incorporating federal law. *See, e.g.*, Ga. Code Ann. § 16-11-129(b)(2)(B); La. Stat. Ann. § 40:1379.3(C)(6); 18 Pa. Cons. Stat. § 6109(e)(1)(viii); Tex. Gov't Code Ann. § 411.172(a)(3); W. Va. Code Ann. § 61-7-4(b)(5); *Range*, 53 F.4th at 272 (citing statutes). *Bruen* explained that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S. Ct. at 2138 n.9. The Court said that those regimes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. And Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id*. at 2162 (Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would make little sense if the Second Amendment in fact prevented

22

legislatures from disarming felons.  Thus, the Amendment's text—and the Supreme Court's decisions interpreting that text—demonstrate that the Amendment does not prohibit the disarming of felons.

### 2. The Nation's historical tradition confirms that felons can be dispossessed of firearms.

Section 922(g)(1)'s constitutionality is further confirmed by a review of "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  Specifically, two types of historical laws support § 922(g)(1)'s constitutionality: (1) laws authorizing capital punishment and estate forfeiture for felons, and (2) laws disarming those deemed untrustworthy based on lack of adherence to the rule of law.

### a. Laws authorizing capital punishment and estate forfeiture

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158.  In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt."  4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769).  Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them."  *Id.* at 98 (capitalization omitted).

23

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General of the U.S.*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

A few examples demonstrate the severe consequences of committing a felony at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting. 2 Laws of the State of New York Passed at the Sessions of the

Legislature (1785-1788) at 664-65 (1886).  The act established that every person

convicted of an offense making the person "liable to suffer death, shall forfeit

to the people of this State, all his, or her goods and chattels, and also all such

lands, tenements, or hereditaments" the person possessed "at the time of any

such offence committed, or at any time after."  *Id.* at 666.  For all other

felonies, the authorized punishment for "the first offence" was a "fine,

imprisonment, or corporal punishment," and the punishment "for any second

offense or felony committed after such first conviction" was "death."  *Id.* at

665.

Two years earlier, New York had passed a law severely punishing

counterfeiting of bills of credit.  2 Laws of the State of New York Passed at the

Sessions of the Legislature (1785-1788) at 260-61 (1886).  The law said a

counterfeiter "shall be guilty of felony, and being thereof convicted, shall

forfeit all his or her estate both real and personal to the people of this State,

and shall be committed to the bridewell [correction house] of the city of New

York for life, and there confined to hard labor."  *Id.* at 261.  In addition, "to

prevent escape," the defendant was to be "branded on the left cheek with the

letter C, with a red hot iron."  *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery,

which the legislature believed had previously "ha[d] not a punishment

sufficiently exemplary annexed thereto." 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302-03.

Throughout the 1700s, other American colonies punished a variety of crimes with death, estate forfeiture, or both. For example, a 1700 Pennsylvania law provided that any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor." 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. As 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any

26

will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements."  1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811).  A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony."  Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767).  And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.  Thus, "tradition and history" show that "those convicted of

27

felonies are not among those entitled to possess arms" under the Second

Amendment. *Id.* at 158, 160.

### b. Laws disarming untrustworthy individuals and those outside the political community.

A second category of historical laws also provides an analogy to felon

disarmament—laws that "categorically disqualified people from possessing

firearms based on a judgment that certain individuals were untrustworthy

parties to the nation's social compact." *Range*, 53 F.4th at 274.  In 1689, the

same Parliament that "wr[ote] the 'predecessor to our Second Amendment'

into the 1689 English Bill of Rights," *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*,

554 U.S. at 593), also passed an "Act for the better secureing the Government

by disarming Papists and reputed Papists."  1 W. & M., Sess. 1, ch. 15, 6

Statutes of the Realm 71.[2]  That Act provided that any Catholic who refused to

make a declaration renouncing his faith could not possess any "Arms

Weapons Gunpowder or Ammunition (other th[a]n such necessary Weapons

as shall be allowed to him by Order of the Justices of the Peace . . . for the

defence of his House or person)." *Id.* at 72.  The required oath "was a gesture

---

[2] Though the statutory compilation identifies this as a 1688 act, it was
enacted in 1689.  *See* 14 Journal of the House of Lords (1685-1691) 208-09
(reflecting enactment on May 11, 1689).

of allegiance to the English government and an assurance of conformity to its laws." *Range*, 53 F.4th at 275.

American colonies enacted similar laws. For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted). And during the French and Indian War, Virginia passed a law disarming Catholics that allowed them to keep their arms if they swore an oath of allegiance to the king. 7 Statutes at Large; Being A Collection of All the Laws of Virginia 35-36 (1820) (1756 law). These laws discriminating based on race or religion are repugnant and would be unconstitutional today for reasons having nothing to do with the Second Amendment, but they nevertheless demonstrate that colonial legislatures "had the power and discretion to use status as a basis for disarmament" even of non-violent groups. *Range*, 53 F.4th at 276 n.18.

During the Revolutionary War, Connecticut passed a law providing that any person who "shall libel or defame" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." Public Records of the Colony of Connecticut 193 (1890) (1775 law). And, at the recommendation of the

29

Continental Congress, *see* 4 Journals of the Continental Congress 205 (1906) (resolution of March 14, 1776), at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states*, see, e.g.*, 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law). Again, these laws demonstrate that, at the time of the founding, legislatures had the authority to disarm even non-violent people whom they deemed not to be law-abiding and trustworthy. Indeed, although this Court has not found it necessary to conduct an in-depth "analysis of the historical scope of the Second Amendment right" when assessing felon-possession statutes, it has observed that the government "offer[ed] substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" *Pruess*, 703 F.3d at 246 n.3.

The right to bear arms is analogous to historical laws that made certain civic rights subject to forfeiture by individuals convicted of crimes. Felons were generally excluded from service on juries in eighteenth-century America. *See* Brian C. Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. Univ. L. Rev. 65, 179 (2003). They were also generally excluded from voting. "[E]leven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons." *Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967). Just as historical laws required persons convicted of felonies to forfeit civic rights, § 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment).

### c.    Comparison to § 922(g)(1)

Both types of historical statutes discussed above demonstrate § 922(g)(1)'s constitutionality. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. *Bruen* identified two relevant metrics for this analogical inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Put

31

another way, the "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* (emphasis and quotations omitted).

Under the first metric, § 922(g)(1) imposes *no* "burden [on] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. "[C]onviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton*, 848 F.3d at 626. Moreover, the burden imposed on the felon's rights is comparable to historical laws disarming the untrustworthy and *less* severe than many historical felony-punishment laws, which often included the death penalty and forfeiture of one's entire estate.

Furthermore, the modern and historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical laws sought to adequately punish felons and deter re-offending, as well as to protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose. It seeks to protect society from gun violence committed by felons, who have previously show disregard for society's laws and are more likely to reoffend, potentially in dangerous ways.

Shade contends that § 922(g)(1) is inconsistent with the nation's history of firearm regulation because "neither the federal government nor a single state barred all people convicted of felonies [from possessing firearms] until the 20th century." Br. 49. But Shade misunderstands *Bruen*'s historical inquiry. *Bruen* emphasized that the government need only identify a "historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. As explained above, § 922(g)(1) and the historical laws are "relevantly similar," *id.* at 2132, because they imposed severe consequences on the commission of a felony and authorized legislatures to disarm untrustworthy people.

Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed § 922(g)(1) as violating the Second Amendment. As one district court recently observed, a "list of the laws that *happened to exist* in the founding era is . . . not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

Shade also argues that "committing a serious crime did not result in a permanent disarmament," asserting that Massachusetts law required the return

33

of firearms to participants in the Shays's Rebellion after three years.  Br. 53.

Shade misreads the Massachusetts law, which actually required that rebels

seeking a pardon from the governor swear an oath of allegiance and surrender

their arms for three years.  Acts and Resolves of Massachusetts 1786-87 at 176-

78 (1893).  The act merely set forth the conditions for executive clemency; it

hardly establishes any general rule that disarmament must always be

temporary.

In sum, § 922(g)(1) is consistent with the nation's historical tradition of

firearm regulation.  Shade cannot show that the district court committed clear

or obvious error in failing to hold § 922(g)(1) unconstitutional either on its face

or as applied to Shade.

### D.    At the very least, § 922(g)(1) is constitutional as applied to Shade based on his prior convictions for violent felonies.

In any event, § 922(g)(1) is constitutional as applied to those like Shade

who are dangerous felons.  A few judges and commentators have maintained

that the Second Amendment allows disarming only *dangerous* felons.  *See*

*Kanter v. Barr*, 919 F.3d 437, 451, 454, 464 (7th Cir. 2019) (Barrett, J.,

dissenting); *Folajtar*, 980 F.3d at 912-15 (Bibas, J., dissenting); Joseph G.S.

Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from*

*Possessing Arms*, 20 Wyo. L. Rev. 249, 257-67, 285-86 (2020).  That minority

view is incorrect because it lacks support in either *Heller*'s interpretation of the

34

Amendment's text or the historical record. But Shade could be disarmed on account of his felony status even under that minority view.

"[W]hether a government can forbid *violent* felons from possessing a firearm has not been meaningfully questioned by courts to date." *United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (unpublished). And Shade's prior offenses are unquestionably violent. He was convicted on five counts of assault with a deadly weapon arising from an incident in which he shot at police officers and assaulted three others. J.A.103, J.A.345-346. He therefore cannot show error—much less plain error—in his conviction under § 922(g)(1). *See Gonzalez*, 2022 WL 4376074, at *2 (concluding "it would be frivolous to argue that § 922(g)(1) is unconstitutional as applied to" the defendant, who had been convicted of attempted murder).

## II. The District Court's 60-Month Sentence Was Procedurally Reasonable.

Shade also contends that the district court erred at sentencing by (a) holding that North Carolina assault with a deadly weapon with intent to kill is a "crime of violence" under USSG § 4B1.2, (b) finding that Shade recklessly endangered others when fleeing from the police, (c) failing to adequately explain its reasons for not departing downward further, and (d) failing to properly consider the statutory sentencing factors. Br. 6-32. Each of those arguments is incorrect.

35

## A.    Standard of review

This Court generally "review[s] sentences 'under a deferential abuse-of-discretion standard.'"  *United States v. Dennings*, 922 F.3d 232, 235 (4th Cir. 2019) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)).  But "[o]n a challenge to a district court's application of the Guidelines," the Court "review[s] questions of law de novo and findings of fact for clear error." *United States v. Hawley*, 919 F.3d 252, 255 (4th Cir. 2019) (quotations omitted).

This Court should review de novo whether Shade's prior offenses were crimes of violence under the Guidelines.  *See United States v. Covington*, 880 F.3d 129, 131-32 (4th Cir. 2018).  It should review for clear error the district court's finding that Shade recklessly endangered others during his flight from police.  *See United States v. Burnley*, 988 F.3d 184, 191 (4th Cir. 2021).  It should review for abuse of discretion whether the district court adequately explained its decision regarding a downward departure, *United States v. Hale*, 834 Fed. App'x 789, 792 (4th Cir. 2020) (per curiam) (unpublished), and whether the court adequately considered the statutory sentencing factors, *United States v. McCain*, 974 F.3d 506, 515-17 (4th Cir. 2020).

## B.    North Carolina assault with a deadly weapon with intent to kill is a crime of violence under the Guidelines.

Under USSG § 2K2.1(a)(4)(A), a defendant's base offense level is 20 if he "committed any part of the instant offense subsequent to sustaining one

36

felony conviction of . . . a crime of violence." The term "crime of violence" is defined as any state or federal offense, punishable by imprisonment for more than a year, that "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is . . . aggravated assault." USSG § 4B1.2(a). "To determine whether a predicate offense is a crime of violence," this Court "use[s] the categorical approach." *United States v. Rice*, 36 F.4th 578, 580 (4th Cir. 2022). That approach focuses on whether "the elements of the statute of conviction" "necessarily involve[ ]" the use of force, a standard which requires "purposeful or knowing conduct." *Borden v. United States*, 141 S. Ct. 1817, 1822, 1828 (2021) (plurality opinion).

### 1.    The offense involves purposeful or knowing conduct.

The district court correctly determined that Shade's 2014 convictions for North Carolina assault with a deadly weapon with intent to kill involved the use, attempted use, or threatened use of physical force against the person of another. Contrary to Shade's contention (Br. 17), the North Carolina offense cannot be committed by mere recklessness or negligence. The statute applies to "[a]ny person who assaults another person with a deadly weapon *with intent to kill*." N.C. Stat. Ann. § 14-32(c) (emphasis added). The plain text of the statute, which requires an intent to kill, requires "purposeful or knowing conduct." *Borden*, 141 S. Ct. at 1828.

37

This Court's decisions confirm this plain text reading. In an unpublished decision, this Court held on plain-error review that § 14-32(c) is a "crime of violence" for purposes of USSG § 4B1.2. *United States v. Vereen*, 703 Fed. App'x 171, 173-74 (4th Cir. 2017) (per curiam) (unpublished). Like Shade, the defendant in *Vereen* argued that the offense may be proven by "a mens rea less culpable than recklessness." *Id.* at 173. The Court rejected that argument, observing that "North Carolina courts have repeatedly observed that [the offense] 'has, as an element, specific intent to kill.'" *Id.* (quoting *State v. Coble*, 527 S.E.2d 45, 49 (N.C. 2000)). And, "[a]s North Carolina courts have recognized, proving specific intent requires more than showing . . . recklessness or criminal negligence." *Id.*

A year later, this Court similarly held that an aggravated version of the same offense—assault with a deadly weapon with intent to kill inflicting serious injury, N.C. Stat. Ann. § 14-32(a)—involves the use, attempted use, or threatened use of physical force against the person of another under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). *United States v. Townsend*, 886 F.3d 441, 447 (4th Cir. 2018). The Court rejected the defendant's reliance on "dicta" in *State v. Jones*, 538 S.E.2d 917, 923 (N.C. 2000), suggesting that "intent to kill may be satisfied by proving only culpable negligence or recklessness," *Townsend*, 886 F.3d at 447. The Court explained that, "prior to

38

*Jones*, proof of a specific intent to kill was an essential element" of the relevant offense. *Id.* And the Court declined to "read *Jones* to change the mens rea required to prove a specific intent to kill for [the relevant statute] where the Supreme Court of North Carolina did not see fit to even discuss the purported major change in the law." *Id.*

Although *Townsend* involved subsection (a) of § 14-32, its reasoning applies with equal force to subsection (c). Both subsections require "intent to kill." And, as in *Townsend*, the North Carolina Supreme Court held before *Jones* that "assault with a deadly weapon with intent to kill has, as an element, specific intent to kill." *Coble*, 527 S.E.2d at 49; *see State v. Ferguson*, 135 S.E.2d 626, 628 (N.C. 1964) ("[T]he intent to kill is an essential element of such charge."). As *Townsend* explained, *Jones*'s dicta did not alter that precedent. And in the ACCA context, this Court has specifically held that *Townsend*'s reasoning applies to § 14-32(c). *United States v. Holland*, 749 Fed. App'x 162, 166 (4th Cir. 2018) (per curiam) (unpublished); *United States v. Jackson*, 738 Fed. App'x 152, 154 (4th Cir. 2018) (per curiam) (unpublished). The same is true with respect to the Guidelines.

Shade briefly contends that this Court has treated the statute's intent element "as *per se* evidence of a crime of violence," in conflict with *United States v. Taylor*, 142 S. Ct. 2015, 2020 (2022), which Shade claims "rejected any

39

consideration of the Defendant's intent in the 'categorical approach,'" Br. 21. Shade misconstrues both *Taylor* and this Court's precedent. *Taylor* held that attempted Hobbs Act robbery—which requires "an intention to take property by force or threat, along with a substantial step toward achieving that object"—did not necessarily involve the use, attempted use, or threatened use of force against a person or property under 18 U.S.C. § 924(c)(3)(A). *Taylor*, 142 S. Ct. at 2020. Although *Taylor* indicates that merely *intending to use* force is insufficient to involve the use of force, it does not call into question this Court's decisions holding that the *intentional use* of force satisfies § 4B1.2's elements clause and similarly worded statutory provisions.

### 2. The offense requires a communicated threat.

Contrary to Shade's contention (Br. 17-21), his North Carolina assault conviction required a "communicated threat," rather than simply an "objective or abstract risk" of harm. *Taylor*, 142 S. Ct. at 2023-24. Simple assault in North Carolina requires either (1) an attempt, "with force and violence, to do some immediate physical injury to the person of another" sufficient to put "a person of reasonable firmness in fear of bodily harm," or (2) "a show of violence accompanied by reasonable apprehension of immediate bodily harm or injury on the part of the person assailed which causes him to engage in a course of conduct which he would not otherwise have followed." *State v.*

*Roberts*, 155 S.E.2d 303, 305 (N.C. 1967) (quotations omitted). Both ways of committing the offense require a communicated threat to a victim, as opposed to a mere "abstract risk" of harm. *Taylor*, 142 S. Ct. at 2023.

In arguing to the contrary, Shade cites cases showing that assault can occur without proof that the victim was *personally* placed in fear so long as the defendant's actions would put a reasonable person in fear. Br. 19; *see State v. Starr*, 703 S.E.2d 876, 878, 880 (N.C. Ct. App. 2011) (defendant shot at firefighters as they forced entry into a flooding apartment); *State v. Musselwhite*, 297 S.E.2d 181, 184 (N.C. Ct. App. 1982) (defendant swung a knife at a police officer but missed). But those cases do not conflict with *Taylor*, which said only that the "threatened use" of force requires a "communicated" threat, not that the threatened person must actually be placed in fear.

Moreover, Shade's hypothetical scenario—in which D attempts to threaten A with a gun that D believes is operable but A knows is inoperable—likely would not be assault under North Carolina law. North Carolina assault requires a threat that would "put a person of reasonable firmness in fear," *Roberts*, 155 S.E.2d at 305 (quotations omitted), and state-court precedent indicates this means a person in the *victim's* position, *see State v. Cogdell*, 599 S.E.2d 570, 576 (N.C. Ct. App. 2004) (Levinson, J., concurring) (explaining that no assault on a prison guard for throwing excrement occurs "where no

41

reasonable person in the guard's position would fear that the contaminant would actually touch him"). In Shade's hypothetical, a reasonable person who, like the victim, knew the firearm was inoperable would not feel threatened. Thus, Shade cannot show that assault with a deadly weapon with intent to kill can be committed without a communicated threat or that the district court erred in concluding that the offense is a crime of violence.

### C. The district court did not clearly err in finding that Shade recklessly endangered others during flight from police.

Shade also incorrectly contends (Br. 21-23) that the district court erred by imposing USSG § 3C1.2's two-point enhancement, which applies where the defendant "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." A defendant acts "recklessly" where he "was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." USSG § 2A1.4 cmt. n.1; *see* USSG § 3C1.2 cmt. n.2 (cross-referencing § 2A1.4's definition).

The district court correctly found that "all of the facts and circumstances . . . support the enhancement for reckless endangerment." J.A.227. The evidence showed that Shade "ran a red light, passed stopped traffic by driving against the flow of traffic on the wrong side of the road, and ran another red

light." J.A.315. The district court observed that the record "particularly identified" the intersections where this occurred, and the court took "judicial notice of the fact that they are . . . probably the two busiest intersections in the southern part of Buncombe County." J.A.227; *see* J.A.103 (identifying starting and ending addresses of Shade's flight). Moreover, Shade was carrying four firearms in his vehicle, J.A.104-105, J.A.341-342, creating a further risk to others. *See United States v. Carter*, 474 Fed. App'x 331, 333 (4th Cir. 2012) (per curiam) (unpublished) (upholding the § 3C1.2 enhancement where the defendant "drove his vehicle through two stop signs and residential neighborhoods, reaching speeds in excess of 55 mph in a 35 mph zone, while armed with a loaded handgun").

As Shade points out (Br. 22), "the fact of a vehicular flight, alone, does not necessarily justify an application of § 3C1.2. Something more is required." *Burnley*, 988 F.3d at 191 (citing *United States v. Harper*, 466 F.3d 634, 649 (8th Cir. 2006)). But that "[s]omething more" need not be, as Shade suggests (Br. 22-23), actually striking or injuring a person or vehicle. Instead, the question is whether the high-speed chase is accompanied by "additional facts creat[ing] sufficient risk." *Burnley*, 988 F.3d at 191. As the district court observed, this case involved "a number of things beyond simply exceeding the speed limit

43

during the chase, particularly running a red light through two intersections."
J.A.226-227.

In unpublished decisions, this Court has frequently upheld the
application of § 3C1.2 where the defendant engaged in a high-speed chase or
unsafe driving. *See, e.g., United States v. Williams*, 665 Fed. App'x 290, 294 (4th
Cir. 2016) (per curiam) (unpublished) (the defendant "led the police on a high-
speed chase, on a two-lane, business access road, during which [the
defendant's] top speed approached 70 mph"); *United States v. Buie*, 441 Fed.
App'x 173, 177 (4th Cir. 2011) (per curiam) (unpublished) (the defendant "fled
from police at speeds upwards of one hundred miles per hour, during which he
weaved between cars on the highway" and "continued his flight through
residential streets . . . to an elementary school parking lot"); *United States v.
Weaver*, 425 Fed. App'x 267, 269 (4th Cir. 2011) (per curiam) (unpublished)
(the defendant "led police on a high-speed chase past several vehicles and
placed the pursuing officer and the passengers in his car in danger"); *United
States v. Evans*, 403 Fed. App'x 818, 819 (4th Cir. 2010) (per curiam)
(unpublished) (the defendant "accelerated to a speed 'well over the reckless
limits' despite the presence of other vehicle, 'just barely made' one turn, and
later spun out of control"); *United States v. Jones*, 174 Fed. App'x 791, 792 (4th
Cir. 2006) (unpublished) (the defendant "reached speeds of seventy-five miles

per hour in a residential neighborhood on icy roads and ignored traffic signals in his flight").  The district court did not clearly err in concluding that Shade recklessly created a substantial risk of death or serious bodily injury during flight.

### D.    The district court did not abuse its discretion when explaining its reasons for rejecting Shade's request for a downward departure or variance.

Shade incorrectly contends that the district court failed to (a) consider his requests for a downward departure or variance and (b) adequately explain its reasons for denying those requests.  Br. 23, 25, 26, 27.  A district court must "consider the defendant's nonfrivolous arguments for a downward departure . . . and explain the sentence chosen." *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017).  The explanation "need not be extensive, but the record must make clear that the judge actually listened to, considered, and rendered a decision on these arguments such that this Court can conduct a meaningful review of the sentence imposed." *United States v. Harris*, 890 F.3d 480, 485 (4th Cir. 2018).

The district court's explanation was adequate here.  Before sentencing, Shade argued that four Guidelines departure provisions "warrant[ed] consideration": mental or emotional conditions (USSG § 5H1.3), lesser harms (USSG § 5K2.11), coercion or duress (USSG § 5K2.12), and diminished

45

capacity (USSG § 5K2.13).  J.A.380-384; *see* J.A.356.  At sentencing, the

district court recognized the "need" to consider "the mental and emotional

condition of the defendant, the lesser-harms factors under 5K2.11, and the

diminished capacity."  J.A.267.  The court first explained that the facts did not

support Shade's lesser-harms argument—that he acquired the firearms only to

protect his family—"because the defendant already had possession of a

firearm" before purchasing three more from the undercover detective.

J.A.267.  The court observed that Shade's "better arguments" were based on

his "mental and emotional condition" and "diminished capacity."  J.A.268.

The court said, "I've taken that into account, and that's . . . why I have gone

. . . pretty close to the low end of the guideline range in this case."  J.A.268.

The court later noted that Shade's "mental and emotional condition and

diminished capacity" were "a mitigating factor" that affected the sentence

imposed.  J.A.269.

Shade contends that the district court "failed to articulate the effect" that

the diminished-capacity and mental-and-emotional-conditions departures "had

on [Shade's] sentence."  Br. 25.  In fact, the court explained that those factors

led it to impose a sentence "pretty close to the low end of the guideline range."

J.A.268.  The court had no obligation to explain exactly how much these

considerations reduced Shade's sentence.  *See United States v. Bah*, 694 Fed.

App'x 122, 125 (4th Cir. 2017) (per curiam) (unpublished) ("Bah points to no binding authority for the proposition that remand is necessary when the district court fails to quantify the extent of a downward departure but adequately explains the reasons for its final sentence."). And the Supreme Court has found a "brief" explanation adequate where "the sentencing judge listened to each argument" but "simply found the[ ] circumstances insufficient to warrant a sentence lower than the Guidelines range." *Rita v. United States*, 551 U.S. 338, 358 (2007). Here too, the court adequately explained its sentence.

Shade incorrectly asserts that the district court "did not even consider" the "coercion, blackmail, or duress" departure in § 5K2.12. Br. 27. Although the district court did not use the words "coercion," "blackmail," or "duress," Shade's asserted basis for that departure was identical to his asserted basis for the lesser-harms departure. *Compare* J.A.172 ("The Defendant criminally possessed a firearm to protect his family after a shooting at his family's home.") *with* J.A.172-173 ("[H]e was driven by a misguided need to protect his family whose house had been shot up by an unknown assailant."). The district court explained why it did not believe a lesser-harms departure was warranted, and the very same reasoning applied to the coercion-or-duress departure.

Shade's remaining arguments are apparently based on his disagreement with the court's decision not to grant a downward departure or variance. Br.

47

23-27.  For example, he suggests that the district court improperly "discounted the effect" of the lesser-harms policy statement in the Guidelines.  Br. 26.  But this Court "lack[s] the authority to review a sentencing court's denial of a downward departure unless the court failed to understand its authority to do so."  *United States v. Brewer*, 520 F.3d 367, 371 (4th Cir. 2008).  Because the district court adequately explained its sentence—and in fact explained that it was imposing a lower-end Guidelines sentence for two of the reasons Shade identified—Shade cannot show any entitlement to relief.

### E.    The district court properly considered the § 3553(a) factors.

Shade is also incorrect in arguing that the district court failed to properly apply the factors in 18 U.S.C. § 3553(a).  Br. 27-32.  Section 3553(a) requires sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  And a district court commits procedural error by, among other things, "failing to consider the § 3553(a) factors, . . . or failing to adequately explain the chosen sentence."  *Gall*, 552 U.S. at 51.

Shade first contends (Br. 30-31) that the district court imposed a "procedurally unreasonable" sentence by "dismiss[ing] the importance of the statistics" showing that firearm offenders in the Western District of North

48

Carolina in 2020 received higher average sentences (55 months) than firearms

offenders nationwide (48 months) and were more likely to receive a sentence

within the guidelines range (70%) than offenders nationwide (52%).  *See*

United States Sentencing Commission, Statistical Information Packet, Fiscal

Year 2020, Western District of North Carolina at 11, 16, Tables 7 & 10,

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/

federal-sentencing-statistics/state-district-circuit/2020/ncw20.pdf.

 Contrary to Shade's claim, the district court committed no procedural

error.  The district court directly addressed Shade's statistical argument at

sentencing, saying it "discount[ed] that sort of statistical information because

each of those cases is different" and some defendants "deserve sentences much

longer than this" while others "deserve a shorter sentence."  J.A.269.

Although Shade disagrees, he cannot show that the court's fully explained

decision was "procedurally unreasonable."  Br. 31.  And to the extent Shade

raises a substantive-reasonableness claim, he fails to show that his

presumptively reasonable within-Guidelines sentence is "unreasonable when

measured against the § 3553(a) factors."  *United States v. Gutierrez*, 963 F.3d

320, 344 (4th Cir. 2020).

 Moreover, this statistical information does not show that Shade was

"sentenced to [a] longer term of imprisonment because he was sentenced in the

Western District of North Carolina." Br. 30. It simply shows that *other* defendants sentenced in that district in 2020 received sentences longer than the national average. As this Court has recognized, sentencing "requires an *individualized* assessment of the facts and circumstances presented by that particular defendant," and therefore comparisons to nationwide statistical data cannot establish unwarranted sentencing disparities. *United States v. Hawes*, 309 Fed. App'x 726, 735 (4th Cir. 2009) (unpublished). Statistical data about other sentences "does not provide the information necessary to determine whether the defendants who received such sentences are truly comparable to the defendant at hand." *Id.*

Shade also contends (Br. 31-32) that the district court failed to consider the sentencing range called for by the Guidelines, as required by § 3553(a)(4)(a)(i). He points to the court's statement that it would have imposed the same sentence "even if [it] had sustained every one of the defendant's objections" under the Guidelines. J.A.265. The court's statement does not suggest that it failed to "consider" the "sentencing range . . . set forth in the guidelines." 18 U.S.C. § 3553(a)(4), (a)(4)(A). The court addressed Shade's objections to the Guidelines calculation, J.A.224-225, J.A.226-227, J.A.243-246, calculated Shade's imprisonment range as being 57 to 71 months, J.A.248, and tethered Shade's final sentence to the guideline range, J.A.268.

50

The district court simply explained that, even if Shade's "technical" (and ultimately meritless) challenges to the guideline range were correct, a 60-month sentence was justified. J.A.265-266. The court fully complied with the statutory requirement to consider the Guidelines.

### F. Any possible error in calculating the Guidelines range or explaining the reasons for the sentence was harmless.

In any event, any error in applying the Guidelines or explaining the sentence was harmless. An error in calculating the guideline range is harmless if "(1) the district court would have reached the same result even if it had decided the Guidelines issue the other way, and (2) the sentence would be reasonable even if the Guidelines issue had been decided in the defendant's favor." *United States v. Cisson*, 33 F.4th 185, 190 (4th Cir. 2022) (brackets and quotations omitted). And a district court's failure to properly explain its sentence is harmless where "the error did not have a substantial and injurious effect or influence on the result" and this Court "can say with fair assurance that the district court's explicit consideration of the defendant's arguments would not have affected the sentence imposed." *United States v. Boulware*, 604 F.3d 832, 838 (4th Cir. 2010) (quotations and other punctuation omitted).

When sentencing Shade, the district court observed that it had "spent a lot of time" addressing "arguments on some very, very technical points." J.A.265. The court said, "I have come to the conclusion that, even if I had

51

sustained every one of the defendant's objections on those technical points, my sentence would be exactly the same." J.A.265. Recognizing that Shade's arguments would "have great gravity when it comes to Section 924 or an ACCA revision or something like that," the Court explained that Guidelines § 4B1.2 is "supposed to give guidance . . . based on facts, . . . not some hypothetical." J.A.265. Thus, the court clearly indicated that it would have imposed the same sentence even if had accepted Shade's challenges to the Guidelines calculation. And even if the district court's explanation for its sentence were somehow deficient, the record leaves "no doubt that the district court considered [Shade's] argument[s]" for a below-guidelines sentence, and those arguments "were very weak." *Boulware*, 604 F.3d at 839.

Additionally, Shade's 60-month sentence was reasonable. He was convicted in 2014 of firing a handgun at multiple people (including two police officers) "with intent to kill." J.A.345. His offense in this case came only three-and-a-half years after he was released from prison. J.A.314, J.A.345. And, as the district court observed, there were "a number of aggravating factors: the recklessness with which the defendant fled, the fact that there were multiple guns involved, [and] the fact that there was a stolen firearm that was involved." J.A.267. Any potential error was harmless.

### III.   This Court Should Not Review Shade's Claim That Parts of His Sentencing Memorandum Should Remain Under Seal.

Shade finally attempts to challenge the district court's denial of his motion to seal his sentencing memorandum and attached exhibits. Br. 56-64. This Court should not issue an advisory opinion on the sealing issue because Shade's notice of appeal failed to designate the order he challenges and that order was not final in any event.

### A.   Standard of review

This Court reviews a district court's order to unseal for an abuse of discretion. *Under Seal v. Under Seal*, 326 F.3d 479, 485 (4th Cir. 2003). But this Court has "an independent duty to confirm [its] own jurisdiction." *United States v. Doe*, 962 F.3d 139, 143 (4th Cir. 2020).

### B.   Background

Without objection from the government, Shade moved for leave to file his sentencing memorandum under seal. J.A.358. His two-page motion argued that sealing was appropriate because the memorandum contained "health related or mental health related information protected by HIPAA" which could not be adequately protected without sealing. J.A.358. He publicly filed a redacted version of the sentencing memorandum. J.A.358, J.A.420-454.

At the sentencing hearing in June 2022, the district court observed that "the things that were redacted form a significant part of the basis on which the defendant seeks relief" and that "those portions cannot be sealed" under Fourth Circuit precedent. J.A.212 (citing *Harris*, 890 F.3d 480). The court told defense counsel, "I'm giving you a mulligan on this one," and "I'm going to enter a written order denying your motion to seal, but denying it without prejudice, so that you can go back through and make a determination of which of those redacted portions . . . can't be sealed." J.A.212.

After the sentencing hearing, the district court entered an order denying without prejudice Shade's motion to seal. J.A.280-282. The court acknowledged that the sentencing memorandum and exhibits "contain [Shade's] personal information regarding his present medical condition." J.A.282. But the court observed that this information was "integral to the arguments [Shade] presented at sentencing" and that the "sentencing hearing was public." J.A.282. After balancing Shade's right to privacy against the public's right of access, the court "in its discretion" denied the motion to seal, directing the Clerk to maintain the documents under seal "pending the Defendant's refiling of a proper motion." J.A.282.

On the same day that he filed his notice of appeal from the judgment, Shade filed a "[r]evised" motion to seal, supported by a 19-page

54

memorandum.  J.A.283, J.A.286-304.  He argued that the requested redactions were made "narrowly" to include Shade's "current mental health diagnosis" and "intelligence tests," the "clinical observations" made by the evaluating psychologist, and Shade's "statements" to the psychologist "for the purposes of diagnosis."  J.A.300.  As an alternative to sealing all his original redactions, he requested at least the sealing of more limited redactions.  J.A.284; *see* J.A.459-488 (revised redacted memorandum).  The district court has not yet acted on Shade's revised motion to seal, and Shade's unredacted sentencing memorandum and attachments remain under seal.  *See* J.A.2-11 (docket report).

### C.  Shade's notice of appeal did not designate the order he now seeks to challenge.

Shade says he "appeals" the district court's "decision" denying his "request to seal."  Br. 63.  But his notice of appeal did not designate that order, as required by rule.  *See* Fed. R. App. P. 3(c)(1) ("The notice of appeal must . . . designate the judgment—or the appealable order—from which the appeal is taken . . . .").  Instead, the notice of appeal said that Shade appealed "from the Sentence and Judgment announced . . . on June 23, 2022, and entered on June 27, 2022, along with all previous orders."  J.A.306.  The notice did not designate the order denying the motion to seal, nor can that order be construed as a "previous order[ ]" because it was entered *after* the judgment of conviction

55

(although on the same day).  J.A.10.  This Court should enforce the rule and

not consider the appeal.  *See Smith v. Barry*, 502 U.S. 244, 248 (1992) (although

courts "liberally construe the requirements of Rule 3," that principle "does not

. . . excuse noncompliance").

### D.    The order Shade seeks to challenge is not an appealable final order.

In any event, the order that Shade seeks to appeal is not an appealable

order.  This Court has jurisdiction over "final decisions of the district courts."

28 U.S.C. § 1291.  A final decision is one that "ends the litigation on the merits

and leaves nothing for the court to do but execute the judgment."  *Catlin v.

United States,* 324 U.S. 229, 233 (1945).  Although "an order denying a motion

to seal judicial documents" can be an appealable order, *Doe*, 962 F.3d at 143, it

must be final.

The district court's June 2022 order is not an appealable order because it

was entered without prejudice and has been superseded by a refiled motion to

seal.  *See* J.A.283-305.  This Court has repeatedly held that orders were not

final where they anticipated further litigation or allowed refiling of an

amended petition or complaint.  *See Williams v. Clarke*, 829 Fed. App'x 655,

656 (4th Cir. 2020) (per curiam) (unpublished) (order dismissing § 2254 motion

without prejudice for failure to pay filing fee is not final); *Dorsey v. Kiser*, 697

Fed. App'x 783, 784 (4th Cir. 2017) (per curiam) (unpublished) (order

56

dismissing § 2254 motion without prejudice for failure to comply with district court's order was not final); *United States v. Johnson*, 600 Fed. App'x 140, 141 (4th Cir. 2015) (unpublished) (order dismissing § 2241 petition without prejudice not final where petitioner "may cure the deficiency . . . merely by refiling her habeas action on proper forms"); *Carlton v. Hollingsworth*, 247 Fed. App'x 456, 457 (4th Cir. 2007) (per curiam) (unpublished) ("Because the district court order contemplated further action after this court acted in another appeal, the order was not a final order . . . ."); *Goode v. Central Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 623 (4th Cir. 2015) (order dismissing complaint without prejudice is not final where plaintiff can simply amend), *abrogated on other grounds by Bing v. Brivo Sys., LLC*, 959 F.3d 605 (4th Cir. 2020). Like those orders, the district court's order here did not finally resolve the sealing issue.

The lack of finality is demonstrated by the fact that the district court could choose to *grant* Shade's renewed motion to seal. Shade's renewed motion significantly expanded on his legal arguments for why his proposed redactions are necessary. J.A.286-304. At the very least, the district court could grant Shade's alternative request for more limited redactions. Thus, the court's initial order is not final.

Additionally, to the extent Shade tries to challenge a possible future order denying his renewed motion to seal, such a claim is unripe. "A claim is

not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted). Here, the district court may grant Shade's renewed motion to seal, which would make a decision from this Court unnecessary.

If the district court denies Shade's renewed motion to seal, he may appeal from that final order. *Doe*, 962 F.3d at 143. And if the district court grants that motion, Shade will receive the relief he seeks. What he cannot do is obtain an advisory opinion from this Court on an issue currently pending before the district court. This Court accordingly should not address this claim.

58

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

DENA J. KING
United States Attorney

AMY E. RAY
Assistant United States Attorney
Western District of North Carolina

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,979 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser<br>
WILLIAM A. GLASER

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/William A. Glaser</u>
WILLIAM A. GLASER

61